**State of MINNESOTA, by its Attorney General, Mike HATCH; Minnesota Senior Federation—Metropolitan Region; and Mary Sarno, Plaintiffs,**

v.

**The UNITED STATES of America and Donna E. Shalala, Secretary of Health and Human Services, Defendants.**

**No. 99 CIV. 1831 DDA/FLN.**

United States District Court,
D. Minnesota.

July 7, 2000.

David Woodward, Assistant Attorney General of the State of Minnesota, · St. Paul, Minnesota, appeared on behalf of Plaintiff the State of Minnesota.

Daniel E. Gustafson, Heins Mills & Olsen, P.L.C., Minneapolis, Minnesota, appeared on behalf of Plaintiffs Minnesota Senior Federation—Metropolitan Region and Mary Sarno.

Michelle B. Goodman, United States Department of Justice, Civil Division, Washington, D.C., appeared on behalf of Defendants.

**ORDER**

ALSOP, Senior District Judge.

The question presented in this case is whether the Medicare managed care payment formula set forth in the Balanced Budget Act ("BBA") of 1997, Pub.L. No. 105–33, violates the Constitution. The Court holds that it does not and therefore will grant Defendants' motion to dismiss.

**I.**

**A.**

Congress established Medicare in 1965 as part of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, to provide federally-funded medical insurance for the elderly and disabled. It is a massive program: in fiscal year 1997 approximately 38.8 million people were enrolled, *Fischer v. United States*, —— U.S. ——, 120 S.Ct. 1780, 1783, 146 L.Ed.2d 707 (2000), making it the largest health insurance program in the United States.

Health care benefits covered under the Medicare program are divided into two parts, Part A and Part B. Medicare Part A covers hospital insurance, including inpatient hospital care, skilled nursing facility care, home health agency care, and hospice care. *See* 42 U.S.C. §§ 1395c–1395i–5.

Part A is financed through a federal income tax on self-employment income (the Self–Employment Contributions Act) and federal employment taxes on wages paid to employees (primarily under the Federal Insurance Contributions Act, or FICA). Medicare Part B provides supplemental medical insurance for such things as physician services, laboratory and diagnostic tests, durable medical equipment, medical supplies, ambulance services, and prescription drugs that cannot be ·self-administered. *See id.* §§ 1395j–1395w–4. Part B is voluntary and requires payment of a monthly premium which is uniform throughout the country.

Persons enrolling under Parts A and B historically have had two basic coverage options. They can elect to obtain services through a fee-for-service system under which program payments are made for each service rendered. Or, they can participate in a managed care organization, like a health maintenance organization ("HMO"), which has entered into a payment agreement with Medicare. This suit challenges the method for reimbursing managed care organizations under the BBA, specifically the "Medicare + Choice" program.

### B.

Prior to the passage of the BBA, the payment methods for managed care organizations were set forth in section 1876 of the Social Security Act, 42 U.S.C. § 1395mm, under what was then Part C of the Medicare program. Section 1876 permitted managed care organizations to enter into. either a cost contract or a risk contract, depending on certain statutory requirements. *See* 42 U.S.C. § 1395mm(a), (g), (h); *see also* 42 C.F.R. §§ 417.530–.576 (cost contract); *id.* §§ 417.580–.598 (risk contract). Basically, under a section 1876 cost contract, Medicare paid the actual cost the organization incurred in furnishing covered services. Under a section 1876 risk contract, Medicare paid the organization a single monthly capitation payment in advance for each of its enrollees, and, in return, the organiza-

tion agreed to provide the full range of Medicare .services through an organized system of affiliated physicians, hospitals, and other providers. *See generally* H. Conf. Rep. No. 105–217, at 582–83 (1997), *reprinted in* 1997 U.S.C.C.A.N. 176, 203–04.

Under section 1876 risk contracts, the monthly capitation payment paid to managed care organizations was based on the adjusted average per capita cost ("AAPCC"). 42 U.S.C. § 1395mm(a)(4); *see* 42 C.F.R. § 417.584. The AAPCC was Medicare's estimate of the average per capita amount it would cost to treat a given beneficiary under the fee-for-service system. This amount took into consideration the beneficiary's county of residence and certain other demographic characteristics, such as age, sex, and disability status. 42 U.S.C. § 1395mm(a)(4); *see* 42 C.F.R. § 417.588(c). For each Medicare beneficiary enrolled in a managed care organization, Medicare paid the organization 95% of the AAPCC rate corresponding to the demographic class to which each.beneficiary was · assigned. 42 U.S.C. § 1395mm(a)(1)(C); *see* 42 C.F.R. § 417.584(b)(1).

By nature of being a risk contract, if the actual costs associated with an enrollee were higher than the AAPCC rate, the managed care organization was at risk for the amount. If the costs were lower, the organization could keep the amount of the difference or return it to the Medicare program. Specifically, section 1876 provided that HMOs or other qualified organizations were required at the beginning of each year to determine their adjusted community rate ("ACR"). The ACR was essentially a calculation of the insurance premium the plan would charge a commercial customer for providing Medicare-covered services to the enrollee. 42 U.S.C. § 1395mm(e)(3); *see* 42 C.F.R. § 417.594. An HMO with an ACR that was less than the AAPCC had the option of passing the "savings" on to its enrollees in the form of reduced co-payments or additional health

benefits not covered by Medicare, such as prescription drugs, eyeglasses and hearing aids. 42 U.S.C. § 1395mm(g)(2)-(3); *see* 42 C.F.R. § 417.592(b)(1), (c). Or, the HMO could elect to have its monthly payments reduced or contribute all or a portion of the excess into a stabilization fund. 42 U.S.C. § 1395mm(g)(2); *see* 42 C.F.R. § 417.592(b)(2)-(4). As alleged in the Complaint, most plans opted to pass the savings on to their enrollees in order to attract additional enrollees and increase profitability, name recognition, and market share.

### C.

In the BBA of 1997, Congress added sections 1851 through 1859 to the Social Security Act, 42 U.S.C. §§ 1395w–21–1395w–28, to establish a new Part C of the Medicare program, known as the "Medicare + Choice" program.[1] The stated purpose of Medicare + Choice was to "allow beneficiaries to have access to a wide array of private health plan choices in addition to traditional fee-for-service Medicare ... [and to] enable the Medicare program to utilize innovations that have helped the private market contain costs and expand health care delivery options." H. Conf. Rep. No. 105–217, at 585 (1997), *reprinted in* 1997 U.S.C.C.A.N. 176, 205–06. In particular, Medicare + Choice was designed to increase the options for eligible individuals beyond a traditional managed care plan available under section 1876, such as an HMO, by providing three types of plans: "M + C coordinated care plans (including plans offered by health maintenance organizations, preferred provider organizations, and provider-sponsored organizations), M + C 'MSA' plans, that is, a combination of a high deductible M + C

health insurance plan and a contribution to an M + C medical savings account (MSA), and M + C medical private fee-for-service plans." 63 Fed.Reg. 34968, 34968 (1998).

In addition, Congress under the Medicare + Choice program sought to improve the method by which it calculates payment rates to risk contracting plans. *See* 42 U.S.C. § 1395w–23; *see also* 42 C.F.R. §§ 422.249–.268. As the Health Care Financing Administration recognized, "[t]he AAPCC had been legitimately criticized for its wide range of payment rates among geographic regions—in some cases it varied by over 20 percent between adjacent counties." 63 Fed.Reg. at 35004. Now, under Medicare + Choice, capitation rates are the greater of: (1) a "blended" capitation rate, taking into account both the local, area-specific Medicare costs on which the old AAPCC rates were based and the national costs,[2] (2) a minimum monthly payment, which in 1998 was $367, or (3) a minimum percentage increase of 2% over the previous year's capitation rate. 42 U.S.C. § 1395w–23(c)(1); *see* 42 C.F.R. § 422.252. Thus, while it did not abandon the old AAPCC rates entirely, Medicare + Choice attempted to narrow the amount of payment variation across the country through the use of a new reimbursement formula.

Geographic funding disparities nonetheless persist under the Medicare + Choice payment method. According to the Complaint:

- [I]n 1997 the reimbursement level for HMOs serving Hennepin County, Minnesota residents was $405.63 per member per month, while the reim-

---

**1.** The existing Part C of the statute, which included section 1876, was redesignated as Part D. 63 Fed.Reg. 34968, 34968 (1998).

**2.** The blended rate is adjusted further by a budget neutrality factor designed to ensure that the aggregate payment equals the amount that would have been paid under the AAPCC rate alone. 42 U.S.C. § 1395w–23(c)(5); *see* 42 C.F.R. § 422.254(d). The

blended rate is to be phased in over a six year period, from 1998 through 2002. 42 U.S.C. § 1395w–23(c)(2); *see* 42 C.F.R. § 422.254(a). For the years 1998 and 1999, the budget neutrality adjustment reduced the blended rate to the point where no county's payment rate was based upon the blended rate, since one of the two other rates was higher in every county. 63 Fed.Reg. at 35005.

bursement level for HMOs serving residents in Richmond County, New York, was $767.35 per member per month, a difference of $361.72. Under the BBA, both counties received a 2% increase for 1998. This increased the reimbursement rate in Hennepin County to $413.74 ... and increased the Richmond County, New York, reimbursement rate to $782.70. The result was to widen the gap between these illustrative counties to a $368.96 difference.

- [I]n 1999, the Medicare managed care monthly reimbursement rate for Dakota County, Minnesota, is $394.92. By comparison, the 1999 reimbursement rate for Broward County, Florida, is $676.64; for Los Angeles County, California, $647.70; and for Dade County, Florida, $778.45.

Complaint ¶ 27.

Under Medicare + Choice, moreover, like under section 1876 risk contracts, managed care organizations receiving more from Medicare than it costs them to provide coverage may pass on these savings to their enrollees. 42 U.S.C. § 1395w–24(f)(1); *see* 42 C.F.R. § 422.312. As under the old system, Medicare + Choice relies on participating plans to provide their ACR. It further requires them, when the ACR is less than what they receive, either to provide additional benefits with the excess or to return the amount to the Medicare program. *Id.* The Complaint alleges that this results in a substantial difference in the cost, type, and variety of medical services available to Medicare beneficiaries in different parts of the country:

A senior citizen participating in a Medicare managed care health plan in Broward County[, Florida] pays no annual premium, pays no co-payment for visiting her doctor and pays nothing for prescription drug coverage, for a cov-

ered ambulance trip, for outpatient mental health treatments, or for emergency medical services. By contrast, a Minnesota senior citizen enrolled in a Medicare managed care plan in Dakota County pays an annual premium of $1,137, incurs a $10 co-payment for each doctor visit, must pay out-of-pocket for almost all prescription drugs, must pay twenty percent of the costs of out-of-area ambulance services, pays a $15–$30 co-payment for each mental health session, pays a $30 co-payment for emergency services and must pay a $30 co-payment for urgently needed services.

Complaint ¶ 2.

### D.

This action was brought by the State of Minnesota, by its attorney general (the "State"), and the Minnesota Senior Federation and Mary Sarno (the "private plaintiffs") against the United States and Donna Shalala, the Secretary of Health and Human Services, alleging that the Medicare + Choice payment formulation is unconstitutional.[3] The State alleges that the Medicare + Choice program violates its state sovereignty and principles of federalism guaranteed by the Constitution, including the Tenth Amendment. It contends that, as a result of the funding disparities under the Medicare managed care program, it has incurred significant increased costs in meeting the healthcare needs of its senior citizens. In particular, it claims that the State legislature has had to respond to the funding disparities by enacting a legislative program subsidizing the prescription drug costs of eligible, low income senior citizens in Minnesota. *See* Minn.Stat. § 256.955.

The private plaintiffs allege that the Medicare + Choice payment method violates their equal protection rights because

---

**3.** A number of *amici curiae* also have filed briefs, including members of the Minnesota Congressional Delegation; the States of Kansas, Maine, New Mexico, Oregon, Utah and Vermont, by their respective Attorneys General; the Minnesota Medical Association, Hen-

nepin Medical Society, Ramsey Medical Society, and American Medical Association; the Care Providers of Minnesota; and the National Rural Health Association. All of the *amici curiae* support Plaintiffs' Complaint.

it is not rationally related to a legitimate government end. They argue that, contrary to the stated legislative purpose, the Medicare + Choice payment formula has restricted the availability and scope of health benefits and increased the cost of benefits for senior citizens in Minnesota. The private plaintiffs also allege that the Medicare + Choice program violates their fundamental right to travel. In particular, Mary Sarno, a Florida resident, alleges that she is deterred from and would be penalized for moving to Minnesota because of the geographic funding disparities for managed care organizations.

The State and the private plaintiffs seek a judgment declaring the Medicare managed care funding scheme unconstitutional and an order enjoining the current method of payment. Defendants have moved to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6).

## II.

A motion to dismiss under Rule 12(b)(6) should be granted where " 'it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief.' " *Knapp v. Hanson*, 183 F.3d 786, 788 (8th Cir.1999) (citation omitted). In ruling on a Rule 12(b)(6) motion, the Court takes all facts alleged in the complaint as true and construes the allegations in the complaint and all reasonable inferences arising from the complaint in the light most favorable to the plaintiff. *Id.* In response to Defendants' motion to dismiss, the State and the private plaintiffs submitted voluminous affidavits and exhibits. At oral argument, however, all parties agreed that the motion could be decided based solely on the facts alleged in the Complaint. Accordingly, the Court turns to those allegations.

## III.

Under the First Claim for Relief, the State alleges that, in adopting and implementing the Medicare + Choice funding scheme, Defendants have infringed upon the State's sovereign interest in a manner that violates principles of federalism inher-

ent in our structure of dual government. The State purports to find support for its allegation in a number of constitutional doctrines limiting the power of the federal government, "including but not limited to the Tenth Amendment." (Complaint ¶¶ 49–51.) Defendants counter that Congress' decisions on how to fund and operate Medicare, an exclusively federal program, are authorized under its Spending Clause power and do not interfere with the powers reserved to the states by the Tenth Amendment. They contend further that none of the other federalism concerns cited by the State call the constitutionality of the Medicare + Choice payment formulation into question.

## A.

■ The Court will begin with the State's claim that Medicare + Choice violates the Tenth Amendment. It is of course true that "our Constitution establishes a system of dual sovereignty between the States and the Federal Government." *Gregory v. Ashcroft*, 501 U.S. 452, 457, 111 S.Ct. 2395, 2399, 115 L.Ed.2d 410 (1991). Under our system, the federal government possesses only those powers enumerated in the Constitution. *Id.* "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to people," by the Tenth Amendment. U.S. Const. amend. X.

The State does not challenge Defendants' position that the Medicare program—at least as a whole—is a proper exercise of Congress' power under the Spending Clause to "provide for the ... general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. Nor does it appear that it could. *See Children's Healthcare Is a Legal Duty, Inc. v. Vladeck*, 938 F.Supp. 1466, 1483 (D.Minn.1996) ("There can be little question that the Medicare and Medicaid Acts are programs of disbursement of funds pursuant to Congress' taxing and spending power[.]"); *see also Helvering v. Davis*, 301 U.S. 619, 640–

45, 57 S.Ct. 904, 908–10, 81 L.Ed. 1307 (1937) (determining that Congress' decision to fund certain portions of the Social Security Act—of which Medicare is a part—is a proper use of its spending power). Instead, the State appears to contend that the Tenth Amendment limits the power of Congress to spend in the way it has chosen. Relying on *New York v. United States*, 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) and *Printz v. United States*, 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997), the State argues that Congress, by enacting the Medicare + Choice funding scheme, has "indirectly but essentially directed" State legislative policy and "commandeered" the State's legislative process by effectively requiring the State to pass legislation and appropriate funds to meet the unmet health care needs of seniors. (Complaint ¶ 49.)

The State's reliance on the anticommandeering principle of *New York* and *Printz* is plainly misplaced. In *New York*, the Court considered the constitutionality of three provisions of the Low–Level Radioactive Waste Policy Amendments Act of 1985, a statute requiring state participation in the disposal of nuclear waste. The Court held that the first two provisions were supported by affirmative grants of power to Congress, and therefore "not inconsistent with the Tenth Amendment." *Id.* at 173, 174, 112 S.Ct. at 2427. The third provision, the "take title" provision, required states either to enact legislation providing for the disposal of radioactive waste generated within their borders, or to take title to and possession of the waste. The Court held that both of these options crossed the line from encouragement of a state to regulate in a particular way to outright "coercion." *Id.* at 175, 112 S.Ct. at 2428. "Either way, 'the Act commandeers the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program,' an outcome that has never been understood to lie within the authority conferred upon Congress by the Constitution." *Id.* at 176, 112 S.Ct. at 2428 (quot-ing *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 288, 101 S.Ct. 2352, 2366, 69 L.Ed.2d 1 (1981)).

In *Printz*, the Court extended *New York*'s ban on commandeering the state legislative process to prohibit "conscripting" state executive officials to enforce a federal regulatory program. *Printz*, 521 U.S. at 935, 117 S.Ct. at 2384. At issue in *Printz* were certain interim provisions of the Brady Handgun Violence Prevention Act of 1993 that required local police departments to conduct a background check on individuals who wanted to purchase a handgun. Two law enforcement officers objected to the provisions, arguing that they were "being pressed into federal service" and contending that congressional action "compelling state officers to execute federal laws is unconstitutional." *Id.* at 905, 117 S.Ct. at 2369–70. A majority of the Court agreed. Citing *New York*, it held that the federal government "may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Id.* at 935, 117 S.Ct. at 2384.

The difference between *New York* and *Printz* and this case is stark. In those cases, Congress unambiguously required the states to enact or enforce a federal regulatory program. Here, in contrast, Congress has not required the State or its officers to do anything. The State legislature may have felt pressure to enact legislation to meet the unmet health care needs of its seniors, but this pressure would have come from its own citizens, not Congress. Moreover, any claim that Congress "indirectly" compelled the members of the State legislature to act is not of constitutional significance. The holdings of *New York* and *Printz* are clear: the Tenth Amendment's anticommandeering principle prohibits only *direct* federal compulsion. *See New York*, 505 U.S. at 161, 112 S.Ct. at 2420 (Congress may not " 'commandee[r] the legislative process of the

**1122**

States by *directly* compelling them to enact and enforce a federal regulatory program'") (emphasis added) (quoting *Hodel*); *Printz,* 521 U.S. at 933, 117 S.Ct. at 2383 ("The *mandatory* obligation imposed on [law enforcement officers] to perform background checks on prospective handgun purchasers plainly runs afoul of [this] rule.") (emphasis added).

For similar reasons, the State's suggestion that the Medicare + Choice payment formulation violates its state sovereignty because it, and not Congress, will be held politically accountable for the high costs of health care within its borders lacks merit. To be sure, the Supreme Court in its Tenth Amendment decisions has expressed concern that "where the Federal Government directs the States to regulate, it may be state officials who will bear the brunt of public disapproval, while the federal officials who devised the regulatory program may remain insulated from the electoral ramifications of their decisions." *New York,* 505 U.S. at 169, 112 S.Ct. at 2424; *see also Printz,* 521 U.S. at 929–30, 117 S.Ct. at 2382. But Medicare is a federal program administered by the federal government. Claims that citizens will hold the State accountable for Medicare's shortcomings are therefore particularly specious. As noted above, this case does not raise the concerns addressed in *New York* and *Printz:* the federal government has not "conscripted" state officials into enforcing the Medicare program, nor has it "commandeered" the State into the service of the federal government. The political accountability rationale for striking down federal laws as an infringement on state sovereignty thus is not implicated.

In short, the Medicare + Choice payment formulation "does not require the [Minnesota] legislature to enact any laws or regulations, and it does not require state officials to assist in the enforcement of federal statutes regulating private individuals." *Reno v. Condon,* —— U.S. ——, 120 S.Ct. 666, 672, 145 L.Ed.2d 587 (2000). The Court therefore rejects the State's claim that the Medicare + Choice payment formulation violates the Tenth Amendment

and the principles announced in *New York* and *Printz.*

**B.**

The State also relies on a number of additional doctrines limiting the power of the federal government to argue that the Medicare + Choice program is unconstitutional. Other than highlighting the concerns over various types of intrusions into the sovereignty of the states, however, these doctrines are largely irrelevant here. Indeed, none of them call the constitutionality of the Medicare + Choice program into question.

The State, for example, mistakenly relies on (a different) *New York v. United States,* 326 U.S. 572, 66 S.Ct. 310, 90 L.Ed. 326 (1946), for what it calls a "nondiscrimination rule." At issue in *New York* was the doctrine of intergovernmental tax immunity and, specifically, whether the federal government could tax New York State's mineral water business. The Court sustained the tax. *Id.* at 581, 66 S.Ct. at 314. In doing so, the Court indicated that a discriminatory tax, falling only on the states and not on private parties, would be an unconstitutional interference with the functioning of state government. *Id.* at 575–76, 66 S.Ct. at 311. Thus, the so-called nondiscrimination rule of *New York* prohibits Congress from taxing the states as states. It has no applicability in this litigation, where there is no contention that Congress has singled out the states for different treatment than private individuals. The State's claim that *New York* stands for a much broader prohibition against legislation generating funding inequalities is without support.

Similarly misguided are the State's citations to the Supreme Court's recent Eleventh Amendment jurisprudence. The Eleventh Amendment and cases interpreting it generally prohibit citizens from suing a state without its consent. *See Kimel v. Florida Bd. of Regents,* —— U.S. ——, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000); *Alden v. Maine,* 527 U.S. 706, 119 S.Ct.

2240, 144 L.Ed.2d 636 (1999); *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). But the Medicare + Choice payment formula does not implicate the State's sovereign immunity, so citations to this body of law are curiously out of place.

The State's contentions regarding the lack of a general federal police power and the State's interest in protecting public health also are unavailing. Even the State admits, as it must, that the federal government can legislate in areas of traditional state concern, including public health. *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475, 116 S.Ct. 2240, 2246, 135 L.Ed.2d 700 (1996) (noting how "in recent decades the Federal Government has played an increasingly significant role in the protection of the health of our people"). The State, nonetheless, relies on *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), to argue that Congress has legislated "in an unconstitutional manner, in a way that infringes upon a state's sovereign interests." (State's Mem. in Opp'n to Defs.' Mot. to Dismiss at 21.) The comparison between *Lopez* and this case is without merit, however. In *Lopez*, the Court held that Congress overstepped its bounds under the Commerce Clause to make it a crime to possess a gun in a school zone. *Lopez*, 514 U.S. at 551, 115 S.Ct. at 1626.[4] In contrast, Congress' authority under the Spending Clause to choose how to fund the Medicare program is not in doubt.

Finally, the several states appearing as *amici curiae* erroneously suggest that the Medicare + Choice payment formula offends the so-called "equality principle" from *Coyle v. Smith*, 221 U.S. 559, 31 S.Ct. 688, 55 L.Ed. 853 (1911). The Supreme Court has said that the equality principle is a narrow doctrine: it "applies only to the terms upon which States are admitted to the Union." *South Carolina v. Katzenbach*, 383 U.S. 301, 328–29, 86 S.Ct. 803, 819, 15 L.Ed.2d 769 (1966). Thus, in *Coyle*, the Court held that Congress could not tell Oklahoma, as a condition to its admission to the Union, where to locate its capital because that would place it on a "plane of inequality with its sister states." *Coyle*, 221 U.S. at 565, 31 S.Ct. at 689. *Amici curiae*'s attempt to expand this doctrine to fit the facts of this case borders on the frivolous.

At best, then, the above limitations on the power of the federal government serve as an unremarkable reminder that "we are a nation composed of States," *New York*, 326 U.S. at 575–76, 66 S.Ct. at 311, and that our Constitution "specifically recognizes the States as sovereign entities." *Seminole Tribe*, 517 U.S. at 71 n. 15, 116 S.Ct. at 1131 n. 15. But they do nothing to aid the State in this case.

## IV.

■ In the Second Claim for Relief, the private plaintiffs allege that the Medicare + Choice funding method violates their equal protection rights under the Due Process Clause of the Fifth Amendment.[5] Their basic contention is that the Medicare + Choice payment formulation treats senior citizens differently based solely on where they live without a rational basis for doing so. Defendants respond that the Medicare + Choice program furthers Congress' legitimate end of expanding health care options while containing Medicare costs in a way that is consistent with our equal protection guarantees.

---

4. For a more recent case reaching a similar result, see *United States v. Morrison*, —— U.S. ——, 120 S.Ct. 1740, 1754, 146 L.Ed.2d 658 (2000) (holding that Congress lacked authority under the Commerce Clause and § 5 of the Fourteenth Amendment to provide a civil remedy for victims of gender-motivated violence).

5. The Supreme Court has held that where the federal government makes a classification which, if made by a state, would violate the Equal Protection Clause of the Fourteenth Amendment, then the classification violates the Due Process Clause of the Fifth Amendment. *Bolling v. Sharpe*, 347 U.S. 497, 499–500, 74 S.Ct. 693, 694–95, 98 L.Ed. 884 (1954).

In areas of economic and social welfare, it is well-understood that the government does not violate equal protection "merely because the classifications made by its laws are imperfect." *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970). "The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate [government] interest." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). This standard of review has been called the "paradigm of judicial restraint." *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 314, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993). A law will not be struck down "simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.'" *Dandridge*, 397 U.S. at 485, 90 S.Ct. at 1161 (quoting *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911)).

Citing the legislative history, as noted above, Defendants explain that the purpose of the Medicare + Choice program was to contain costs and expand health care delivery options. These two goals undoubtedly are legitimate, and *amici curiae*'s suggestion that Congress' objective was something much narrower is disingenuous.[6] The real question, therefore, is whether the means chosen to achieve these ends is rational. On this, the Court has little difficulty in concluding that it is.

This is not the first case to raise an equal protection challenge to a legislative decision on how to distribute funds under the Social Security Act. In other cases involving similar claims, the Supreme Court has regularly upheld the legislature's decision under rational basis review. *See, e.g., Bowen v. Gilliard*, 483 U.S. 587, 600, 107 S.Ct. 3008, 3017, 97 L.Ed.2d 485 (1987) (rejecting equal protection challenge to provision in the AFDC statute that required families wishing to receive benefits to take into account child support payments made by a noncustodial parent because it was "rational for Congress to adjust the AFDC program to reflect the fact that support money generally provides significant benefits for the entire family unit"); *Bowen v. Owens*, 476 U.S. 340, 350, 106 S.Ct. 1881, 1887, 90 L.Ed.2d 316 (1986) (holding that certain provisions of the Social Security Act that denied widow's benefits to divorced widows who remarried did not violate equal protection because it was rational for Congress to conclude that "divorced widowed spouses did not enter into marriage with the same level of dependency on the wage earner's account as widows or widowers"); *Dandridge*, 397 U.S. at 486, 90 S.Ct. at 1162 (holding that Maryland's decision to limit the funds available under AFDC to $250 per month was rationally related to its "legitimate interest in encouraging employment and in avoiding discrimination between welfare families and the families of the working poor"). Much of this can be attributed to the deference courts must pay to Congress in these matters:

> "Governmental decisions to spend money to improve the general public welfare in one way and not another are 'not confided to the courts. The discretion belongs to Congress, unless the choice is clearly wrong, a display of arbitrary power, not an exercise of judgment.'" *Mathews v. De Castro*, 429 U.S. 181, 185, 97 S.Ct. 431, 434, 50 L.Ed.2d 389

---

**6.** For example, members of the Minnesota Congressional Delegation assert that the purpose behind Medicare + Choice was "to furnish participating plans with uniform incentives to provide non-covered benefits." (Mem. of Amici Curiae Minn. Cong. Delegation at 6.) This attempt to narrow Congress' objective is not just belied by the record, but also the law is well-established that "those attacking the rationality of the legislative classification have the burden 'to negative *every conceivable basis* which might support it.'" *Beach Communications*, 508 U.S. at 315, 113 S.Ct. at 2102 (emphasis added) (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364, 93 S.Ct. 1001, 1006, 35 L.Ed.2d 351 (1973)).

(1976) (quoting *Helvering v. Davis*, 301 U.S. 619, 640, 57 S.Ct. 904, 908, 81 L.Ed. 1307 (1937)).

*Owens*, 476 U.S. at 345, 106 S.Ct. at 1885. Indeed, as the Supreme Court has recognized, "Congress faces an unusually difficult task in providing for the distribution of benefits under the [Social Security] Act. The program is a massive one, and requires Congress to make many distinctions among classes of beneficiaries while making allocations from a finite fund." *Id.*

In light of these concerns, this Court concludes that Medicare + Choice is rationally related to Congress' legitimate objective of containing costs and expanding health care delivery options. The Medicare + Choice program increases the health care delivery options because it allows many (but certainly not all) elderly Americans to choose between a fee-for-service program, a traditional managed care plan, such as a HMO, or a broad range of plans comparable to those now available through private insurance. It also seeks to contain costs by ensuring that Medicare will not be paying more to managed care organizations than it has to pay in the same county under the traditional fee-for-service program.

The Medicare + Choice payment formulation, moreover, seeks to improve on the previous section 1876 risk contract method of payment. Now, rather than relying solely on the AAPCC rate, Medicare + Choice provides for capitation rates that are the greater of three amounts. The Medicare + Choice payment method is not perfect—it still results in payment rates that vary geographically, and sometimes the amount does not precisely reflect a managed care organization's actual costs. But this discrepancy is the result of geographical differences in the historical fee-for-services costs, and any suggestion that Congress acted irrationally in relying on these historical numbers is untenable in light of the principles underlying rational basis review. *See Beach Communications*, 508 U.S. at 313, 113 S.Ct. at 2101 ("[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices."); *see also Dandridge*, 397 U.S. at 485, 90 S.Ct. at 1161 (acknowledging that " '[t]he problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific' ") (quoting *Metropolis Theatre Co. v. City of Chicago*, 228 U.S. 61, 69–70, 33 S.Ct. 441, 443, 57 L.Ed. 730 (1913)).

This brings us to the private plaintiffs' main objection to the Medicare + Choice payment method. They object that under the Medicare + Choice program, as under the section 1876 risk contracts, managed care organizations receiving more money from Medicare than it costs them to provide services to their enrollees are able to apply the excess either to reduce deductibles and co-payments or to offer additional benefits and services not covered by Medicare. This, the private plaintiffs argue, rewards traditionally high cost and inefficient providers at the expense of more efficient providers, like in Minnesota. But this decision—to allow managed care organizations to share "savings" with Medicare beneficiaries instead of requiring them to return the difference to the Medicare program itself—hardly renders the Medicare + Choice program unconstitutional on equal protection grounds. "[I]n the administration of a fund that is large enough to have a significant impact on the Nation's deficit, general rules must be examined in light of the broad purposes they are intended to serve." *Gilliard*, 483 U.S. at 598–99, 107 S.Ct. at 3016. The Medicare + Choice program increases the health care options of a number of elderly Americans while reducing the strain on the public fisc. The fact that not all elderly Americans—including those in Minnesota—do not enjoy the same windfall as others is unfortunate, but not unconstitutional. Perhaps there are better solutions or solutions that are more fair, but the Medicare + Choice payment method is certainly "rational" in a constitutional sense.

**1126**

**V.**

■ In the Third Claim for Relief, the private plaintiffs allege that the Medicare + Choice program violates their fundamental right to travel.[7] In particular, Mary Sarno alleges that she is deterred from moving from Florida to Minnesota because of the geographic funding disparities for managed care organizations participating in Medicare + Choice. Defendants counter that the Medicare + Choice payment formulation, which applies nationwide, does not implicate the right to travel. They argue that, unlike state residency requirements, the effect of the application of the payment formulation is to treat residents of the same county equally, whether they be new or old.

The right to travel has been firmly established and repeatedly recognized. *See, e.g., Saenz v. Roe,* 526 U.S. 489, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999); *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); *Edwards v. California,* 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed. 119 (1941); *Crandall v. State of Nevada,* 73 U.S. (6 Wall.) 35, 18 L.Ed. 745 (1867). This is true even though the word "travel" is not found in the Constitution. The Supreme Court has offered various sources for the right, including the Commerce Clause, the Privileges and Immunities Clause of Article IV, and the Privileges and Immunities Clause of the Fourteenth Amendment. *See Attorney General of*

*New York v. Soto–Lopez,* 476 U.S. 898, 902, 106 S.Ct. 2317, 2320, 90 L.Ed.2d 899 (1986). Regardless of its source, however, "freedom to travel throughout the United States has long been recognized as a basic right under the Constitution." *United States v. Guest,* 383 U.S. 745, 758, 86 S.Ct. 1170, 1178, 16 L.Ed.2d 239 (1966).

The Supreme Court in *Saenz* recently collected and clarified the case law governing the right to travel. According to the Court, the right to travel "embraces at least three different components":

> It protects the right of a citizen of one State to enter and to leave another State, the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and, for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State.

526 U.S. at 504, 119 S.Ct. at 1525.[8] By far, the majority of recent Supreme Court cases have addressed the third component—that is, "the right of the newly arrived citizen to the same privileges and immunities enjoyed by other citizens of the same State." *Id.* at 503, 119 S.Ct. at 1526. In these cases, the Court has considered state laws that, by classifying residents according to the time they established residence, resulted in the unequal distribution

---

7. The Supreme Court has referred to right to travel analysis as "little more than a particular application of equal protection analysis." *Zobel v. Williams,* 457 U.S. 55, 60 n. 6, 102 S.Ct. 2309, 2312 n. 6, 72 L.Ed.2d 672 (1982). However, because the right to travel is a fundamental right, any law burdening the right is subject to the strict scrutiny standard of review. *See Shapiro v. Thompson,* 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600 (1969). The result under the Third Claim for Relief therefore potentially could be different than under the Second Claim for Relief.

8. The Supreme Court prior to *Saenz* defined the right to travel this way: "A state law implicates the right to travel when it actually deters such travel, when impeding travel is its primary objective, or when it uses any classi-

fication which serves to penalize the exercise of that right." *Soto–Lopez,* 476 U.S. at 903, 106 S.Ct. at 2321 (internal quotations and citations omitted). In their brief, the private plaintiffs primarily rely on this earlier formulation to argue that Medicare + Choice violates their right to travel. While there is no suggestion that the Court's formulation in *Soto–Lopez* is inconsistent with the description in *Saenz,* this Court concludes that since *Saenz* is the most recent statement governing the right to travel, "it provides the proper framework for conducting the required analysis" of Medicare + Choice. *See United States v. Morrison,* —— U.S. at ——, 120 S.Ct. at 1749, 146 L.Ed.2d 658 (2000) (concluding that it should analyze Commerce Clause issue under the framework set forth its most recent decision).

of rights and benefits among otherwise qualified bona fide residents.

Statutes imposing these durational residency requirements are often struck down, most recently in *Saenz*. There, the Court held unconstitutional a California statute limiting the maximum welfare benefits available to newly arrived residents to the amount payable by the State of the family's prior residence. *Id.* at 504–10, 119 S.Ct. at 1527–30. Likewise, in *Shapiro,* the Court concluded that statutory provisions which completely denied welfare assistance to residents of a State or the District of Columbia who had not resided within their jurisdictions for at least one year immediately preceding their applications for assistance was unconstitutional. *Shapiro,* 394 U.S. at 627–38, 89 S.Ct. at 1328–33. Other durational residency requirements have suffered a similar fate. *See, e.g., Soto–Lopez,* 476 U.S. 898, 106 S.Ct. 2317, 90 L.Ed.2d 899 (1986); *Memorial Hospital v. Maricopa County,* 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974); *Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972).

The Medicare + Choice program plainly does not implicate the same concerns as these durational residency requirement cases, despite the private plaintiffs' reliance on many of them. As one court explained in a case raising a right to travel challenge to the payment methodology to calculate Medicare payments to home health agencies, "The challenged statute is not a state law separating one state from others, as in *Shapiro v. Thompson* ..., but a Congressional act enforced nationwide. This law implements the same reimbursement system in all states." *Vermont Assembly of Home Health Agencies, Inc. v. Shalala,* 18 F.Supp.2d 355, 363 (D.Vt. 1998). Under Medicare + Choice, Congress has not placed any conditions on the amount of time a person spends in a state before she is entitled to benefits. New residents have "the same right to vital government benefits and privileges in the States to which they migrate as are enjoyed by other residents." *Memorial Hospital,* 415 U.S. at 261, 94 S.Ct. at 1084.

Thus, the Court finds that the third component of the right to travel is not implicated.

Medicare + Choice also does not violate the other two components of the right to travel. The second component does not apply because the private plaintiffs do not seek to be treated as "welcome visitors." Rather, they seek to become permanent residents of Minnesota. The first component is equally inapplicable. The first component involves the "right to go from one place to another, including the right to cross state borders while en route." *Saenz,* 526 U.S. at 499, 119 S.Ct. at 1525. Laws which place an "obstacle" or an "actual barrier" to a person's right to free interstate movement interfere with this aspect of the right. *See id.* at 499, 119 S.Ct. at 1525 (explaining that law which does not impose an "obstacle" does not offend this component); *Zobel,* 457 U.S. at 60 n. 6, 102 S.Ct. at 2312 n. 6 (stating that right to travel protects persons against the erection of "actual barriers" to interstate movement); *cf. Soto–Lopez,* 476 U.S. at 903, 106 S.Ct. at 2321 (stating that law implicates the right to travel when it "actually deters" such travel). Thus, in *Edwards v. California,* the Court struck down a statute that prohibited the transportation of indigent persons across the California border as a state interference with interstate commerce. 314 U.S. at 174, 62 S.Ct. at 167. Similarly, in *United States v. Guest,* the Court held that the district court erred in dismissing an indictment brought under the criminal sections of the Civil Rights Act of 1964 against six whites for depriving black citizens of the right to travel freely to and from Georgia. 383 U.S. at 759–60, 86 S.Ct. at 1178–79. The concerns of *Edwards* and *Guest* are not at issue here, however, because Medicare + Choice, like the statute in *Saenz,* does not impose an actual obstacle to the right to enter and leave a state. *Saenz,* 526 U.S. at 499, 119 S.Ct. at 1525.

The private plaintiffs' final fall back position is that the Supreme Court's three-

pronged characterization of the right to travel in *Saenz* was not meant to be a limitation on that right. (*See* Minnesota Senior Federation and Mary Sarno's Mem. in Opp'n to Defs.' Mot. to Dismiss at 29 (emphasizing Court's language that right to travel embraces "at least three" different components).) Even if true, which this Court does not decide, the cases on which the private plaintiffs rely for their expansive reading of the right to travel do not help them.[9] For example, the private plaintiffs cite decisions recognizing a right to intrastate travel and a right to international travel.[10] The private plaintiffs also rely on a decision striking down a statute imposing a tax on residents leaving a state and on nonresidents merely passing through,[11] and on a decision *upholding* a statute making willful abandonment of a child by a parent a misdemeanor if the parent remained in the state and a felony if the parent left the state.[12] Medicare + Choice, however, does not raise any of the problems addressed in these cases, and thus the Court declines to expand the right to travel to fit this case based on a few citations to inapposite precedents.

## VI.

Plaintiffs have brought to the Court's attention the glaring disparities in the amount of Medicare reimbursement paid to managed care organizations throughout the country. These differences in payments create significant differences in the cost, type, and variety of medical services available to Medicare recipients nationwide. "But the Constitution does not empower this Court to second-guess [legislative] officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients." *Dandridge*, 397 U.S. at 487, 90 S.Ct. at 1163. This Court's role is only to determine if the laws, as written, violate the Constitution. The reimbursement formula set forth in the Medicare + Choice program does not.

The Court's conclusion that Medicare + Choice does not violate the Constitution is not to be considered a judicial endorsement of a reimbursement system which even Defendants concede results in gross unequal treatment of senior citizens. It is to be hoped that those with ultimate authority to remedy this wrong—indeed those who created it—will promptly recognize the injustice they have created and enact legislation to correct it.

\*      \*      \*      \*      \*      \*

Upon its review of the files, motions and proceedings herein, it is hereby ORDERED that:

1. The motion to dismiss brought by Defendants United States of America and Donna E. Shalala, Secretary of Health and Human Services, is GRANTED, and the claims against them are DISMISSED;

2. The clerk of the court shall enter judgment as follows:

> It is hereby ORDERED, ADJUDGED and DECREED that Plaintiffs' claims against all Defendants are dismissed in their entirety.

9. The Court expresses no opinion as to whether any of the cases the private plaintiffs' cite could be categorized under one of the three components in *Saenz*.

10. *E.g., Aptheker v. Secretary of State*, 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964) (international travel); *Kent v. Dulles*, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958) (international travel); *Lutz v. City of York*, 899 F.2d 255 (3rd Cir.1990) (intrastate travel).

11. *Crandall v. State of Nevada*, 73 U.S. (6 Wall.) 35, 18 L.Ed. 745 (1867).

12. *Jones v. Helms*, 452 U.S. 412, 101 S.Ct. 2434, 69 L.Ed.2d 118 (1981).