Betty D. **RUSSELL**, et al.,

v.

**CHOICEPOINT SERVICES, INC.,** et al.

Nos. Civ.A. 03–1994, Civ.A. 03–2040.

United States District Court, E.D. Louisiana.

Jan. 28, 2004.

Dawn Adams Wheelahan, Attorney at Law, New Orleans, LA, Harold Menton Wheelahan, III, Stephen R. Rue & Associates, Kenner, LA, for Plaintiff.

Daniel Lund, Nathan T. Gisclair, Jr., Montgomery, Barnett, Brown, Read, Hammond & Mintz, Thomas John Fischer, Christopher Mar Guidroz, Simon, Peragine, Smith & Redfearn, LLP, New Orleans, LA, Kumiki Gibson, Raymond W. Bergan, Laurie S. Fulton, Williams & Connolly, Washington, DC, Charles J. Faruki, Jeffrey T. Cox, Ronald I. Raether, Jr., Faruki Ireland & Cox PLL, Dayton, OH, for Defendants.

### Order & Reasons

DUVAL, District Judge.

Before this Court is a Rule 12(b) Motion to Dismiss (Rec.Doc. No. 21) filed by defendant Reed Elsevier, Inc. After reviewing the pleadings, memoranda, and relevant law, and after hearing oral argument, the Court GRANTS the motion.

## I. BACKGROUND

Plaintiffs Betty D. Russell and Yvonne Morse brought the instant suit against defendant Reed Elsevier Services, Inc. ("Reed Elsevier") in July of 2003, claiming, *inter alia*, that defendant violated the Driver's Privacy Protection Act ("DPPA" or the "Act"), 18 U.S.C. § 2721, *et seq.* The Complaint alleges that defendant illegally obtained plaintiffs' and other proposed class members' personal information from the Louisiana Department of Motor Vehicles ("DMV") for the impermissible purpose of disclosure and distribution by resale to Reed Elsevier customers. Plaintiffs further allege that defendant disclosed and distributed said information without any purpose permissible under the DPPA. The DMV disclosed said information to Reed Elsevier who, doing business as LexisNexis, redistributed the informa-

tion to plaintiffs' legal counsel and possibly to others as well. Plaintiffs claim to have sustained injury as contemplated by the DPPA as a result of defendant obtaining and disclosing said information and they seek relief and damages under 18 U.S.C. § 2721, et seq.

## II. LEGAL STANDARDS

### A. Rule 12(b) Motion to Dismiss Standard

The defendant has moved that the plaintiffs' claims under the DPPA should be dismissed for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted. Consequently, the Court will analyze the former challenge under Federal Rule of Civil Procedure 12(b)(1) and the latter under Rule 12(b)(6).

A motion to dismiss filed under Rule 12(b)(1) of the Federal Rules of Civil Procedure challenges the subject matter jurisdiction of a federal district court. See Id. A claim is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the claim. See Home Builders Assoc., Inc. v. City of Madison, 143 F.3d 1006, 1010 (5th Cir.1998). A 12(b)(1) motion may be appropriate when a plaintiff's claim is barred by sovereign immunity, as well as in the typical situation where a defendant alleges that there is no diversity of citizenship between the parties, jurisdictional amount, and/or the plaintiff's claim does not involve a federal question. See 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure, § 1350 (2d ed.2003).

Because federal courts are courts of limited jurisdiction, absent jurisdiction conferred by statute, they lack the power to adjudicate claims. See e.g., Stockman v. Federal Election Comm'n, 138 F.3d 144, 151 (5th Cir.1998). Thus, a federal court must dismiss an action whenever it ap-

pears that subject matter jurisdiction is lacking. Stockman, 138 F.3d at 151.

In considering a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, "a court may evaluate (1) the complaint alone, (2) the complaint supplemented by undisputed facts evidenced in the record, or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." Den Norske Stats Oljeselskap As v. HeereMac Vof, 241 F.3d 420, 424 (5th Cir.2001). Thus, unlike a Rule 12(b)(6) motion to dismiss for failure to state a claim, the district court is entitled to consider disputed facts as well as undisputed facts in the record. See Clark v. Tarrant County, 798 F.2d 736, 741 (5th Cir.1986). Uncontroverted allegations of the complaint, however, must be accepted as true. Den Norske Stats Oljeselskap As, 241 F.3d at 424.

To determine the merit of a motion to dismiss for failure to state a claim upon which relief can be granted, Jefferson v. Lead Ind. Ass'n. Inc., 106 F.3d 1245, 1250 (5th Cir.1997) instructs that "[t]he standard to be applied to a motion to dismiss under Federal Rule 12(b)(6) is a familiar one." The district court must take the factual allegations of the complaint as true and resolve any ambiguities or doubts regarding the sufficiency of the claim in favor of the plaintiff. Fernandez–Montes v. Allied Pilots Ass'n., 987 F.2d 278, 284 (5th Cir.1993). The complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff cannot prove any set of facts in support of her claim that would entitle her to relief. Fernandez–Montes, 987 F.2d at 284, 285; Leffall v. Dallas Independent School District, 28 F.3d 521, 524 (5th Cir.1994). However, conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss. Fernandez–Montes, 987

F.2d at 284; *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1067 (5th Cir. 1994).

Plaintiffs have challenged the timing of defendant's Rule 12(b) motion. Federal Rule of Civil Procedure 12(b) states that defenses enumerated in the rule "shall be made before pleading if further pleading is permitted." Generally, if defendant seeks to assert a Rule 12(b) defense by motion, he must do so before filing an answer. *See* 5A Wright & Miller, *Federal Practice and Procedure,* § 1361. Although a strict interpretation of the timing provision's language leads to the conclusion that the Court must deny any motion made after a responsive pleading as being too late, courts have allowed late-filed defenses arising under Rule 12(b)(1) and 12(b)(6) because they are preserved by Rule 12(g) from the waiver mechanism in Rule 12(h)(2). Motions raising these defenses may be considered by the Court even after responsive pleading has been filed, although they are no longer technically Rule 12(b) motions. Wright & Miller, at § 1361. In keeping with the policy set forth in Rule 12(h)(3) of preserving the defense, both a Rule 12(b)(1) lack of subject matter jurisdiction defense and a Rule 12(b)(6) failure to state a claim defense may be made at any time in the form of a suggestion to the Court prior to final judgment. Wright & Miller, at § 1350. *See Driscoll v. New Orleans Steamboat Co.,* 633 F.2d 1158, 1161 (5th Cir.1981). Also, the Court may assert lack of subject matter jurisdiction, *sua sponte,* at any time. Wright & Miller, at § 1350. Although the instant Rule 12(b) Motion to Dismiss was filed subsequent to defendant's filing of an answer, the Court will nevertheless address defendant's motion.

*B. Driver's Privacy Protection Act*

State DMVs obtain personal information by requiring drivers and automobile owners to provide an address, telephone number, vehicle description, Social Security number, medical information, and photograph as a condition of obtaining a driver's license or registering an automobile. *Reno v. Condon,* 528 U.S. 141, 143, 120 S.Ct. 666, 668, 145 L.Ed.2d 587 (2000). Largely in response to mounting public safety concerns over stalkers' and other criminals' access to the personal information maintained in state DMV records, Congress enacted the Driver's Privacy Protection Act of 1994, 18 U.S.C. § 2721–2725, to regulate the disclosure of such information. *See* 139 Cong. Rec. H1785–01 (1992); 139 Cong. Rec. E2742–02 (1993). The DPPA's regulatory scheme restricts the States' ability to disclose a driver's personal information without the driver's consent. *Reno,* 528 U.S. at 144, 120 S.Ct. 666.

The DPPA generally prohibits a state DMV, its agent, or its contractor from "knowingly disclos[ing] or otherwise mak[ing] available to any person or entity personal information about any individual obtained by the department in connection with a motor vehicle record." 18 U.S.C. § 2721(a). The Act states further that "[it] shall be unlawful for any person knowingly to obtain or disclose personal information, from a motor vehicle record, for any use not permitted under section 2721(b) of this title." 18 U.S.C. § 2722(a). The DPPA defines "personal information" as "information that identifies an individual, including an individual's photograph, social security number, driver identification number, name address (but not the 5–digit zip code), telephone number, and medical or disability information, but does not include information on vehicular accidents, driving violations, and driver's status." 18 U.S.C. § 2725(3). "[M]otor vehicle record" is defined as "any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a

department of motor vehicles." 18 U.S.C. § 2725(1).

The DPPA's ban on obtainment and disclosure of personal information is subject to a number of statutory exceptions. *Reno,* 528 U.S. at 145, 120 S.Ct. 666. Personal information disclosure is permitted (or mandated) for a number of authorized purposes. "Permissible uses" of personal information are listed in 18 U.S.C. § 2721(b):

> Permissible uses.—Personal information referred to in subsection (a) shall be disclosed for use in connection with matters of motor vehicle or driver safety and theft, motor vehicle emissions, motor vehicle product alterations, recalls, or advisories, performance monitoring of motor vehicles and dealers by motor vehicle manufacturers, and removal of non-owner records from the original owner records of motor vehicle manufacturers to carry out the purposes of titles I and IV of the Anti Car Theft Act of 1992, the Automobile Information Disclosure Act (15 U.S.C. 1231 et seq.), the Clean Air Act (42 U.S.C. 7401 et seq.), and chapters 301, 305, and 321–331 of title 49, and, subject to subsection (a)(2), may be disclosed as follows:

> (1) For use by any government agency, including any court or law enforcement agency, in carrying out its functions, or any private person or entity acting on behalf of a Federal, State, or local agency in carrying out its functions.

> (2) For use in connection with matters of motor vehicle or driver safety and theft; motor vehicle emissions; motor vehicle product alterations, recalls, or advisories; performance monitoring of motor vehicles, motor vehicle parts and dealers; motor vehicle market research activities, including survey research; and removal of non-owner rec-

ords from the original owner records of motor vehicle manufacturers.

> (3) For use in the normal course of business by a legitimate business or its agents, employees, or contractors, but only—

> > (A) to verify the accuracy of personal information submitted by the individual to the business or its agents, employees, or contractors; and

> > (B) if such information as so submitted is not correct or is no longer correct, to obtain the correct information, but only for the purposes of preventing fraud by, pursuing legal remedies against, or recovering on a debt or security interest against, the individual.

> (4) For use in connection with any civil, criminal, administrative, or arbitral proceeding in any Federal, State, or local court or agency or before any self-regulatory body, including the service of process, investigation in anticipation of litigation, and the execution or enforcement of judgments and orders, or pursuant to an order of a Federal, State, or local court.

> (5) For use in research activities, and for use in producing statistical reports, so long as the personal information is not published, redisclosed, or used to contact individuals.

> (6) For use by any insurer or insurance support organization, or by a self-insured entity, or its agents, employees, or contractors, in connection with claims investigation activities, antifraud activities, rating or underwriting.

> (7) For use in providing notice to the owners of towed or impounded vehicles.

> (8) For use by any licensed private investigative agency or licensed security service for any purpose permitted under this subsection.

> (9) For use by an employer or its agent or insurer to obtain or verify in-

formation relating to a holder of a commercial driver's license that is required under chapter 313 of title 49.

(10) For use in connection with the operation of private toll transportation facilities.

(11) For any other use in response to requests for individual motor vehicle records if the State has obtained the express consent of the person to whom such personal information pertains.

(12) For bulk distribution for surveys, marketing or solicitations if the State has obtained the express consent of the person to whom such personal information pertains.

(13) For use by any requester, if the requester demonstrates it has obtained the written consent of the individual to whom the information pertains.

(14) For any other use specifically authorized under the law of the State that holds the record, if such use is related to the operation of a motor vehicle or public safety.

18 U.S.C. § 2721(b)

■ In addition to state DMV actions, the provisions of the DPPA apply to the further disclosure of drivers' personal information by private citizens who have obtained that information from a DMV. *Reno*, 528 U.S. at 146, 120 S.Ct. 666. 18 U.S.C. § 2721(c) provides for the resale and redisclosure of personal information obtained by "authorized recipients":

Resale or redisclosure.—An authorized recipient of personal information (except a recipient under subsection (b)(11) or (12)) may resell or redisclose the information only for a use permitted under subsection (b) (but not for uses under subsection (b)(11) or (12)). An authorized recipient under subsection (b)(11) may resell or redisclose personal information for any purpose. An authorized recipient under subsection (b)(12) may resell or redisclose personal information

pursuant to subsection (b)(12). Any authorized recipient (except a recipient under subsection (b)(11)) that resells or rediscloses personal information covered by this chapter must keep for a period of 5 years records identifying each person or entity that receives information and the permitted purpose for which the information will be used and must make such records available to the motor vehicle department upon request.

18 U.S.C. § 2721(c). The Act does not define "authorized recipient."

The DPPA establishes criminal and civil penalties to be imposed on those who fail to comply with its provisions. *Reno*, 528 U.S. at 146, 120 S.Ct. 666. Violators are subject to a criminal fine. 18 U.S.C. §§ 2723(a), 2725(2). Also, private persons who knowingly obtain, disclose, or use personal information from a DMV for a purpose not permitted under the DPPA may be subject to liability in civil action brought by the driver to whom the information pertains. 18 U.S.C. § 2724(a). DPPA violators may be liable for the following: (1) actual damages (not less than liquidated damages in the amount of $2,500); (2) punitive damages; (3) attorneys' fees and other litigation costs; and (4) preliminary and equitable relief. 18 U.S.C. § 2724(b).

### C. Article III Case–or–Controversy

#### 1. Standing

■ A plaintiff must have standing before a federal court may entertain his or her suit. Standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). As the Supreme Court has noted,

It is the role of courts to provide relief to claimants, in individual or class actions, who have suffered, or will immi-

nently suffer, actual harm; it is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution.

*Lewis v. Casey,* 518 U.S. 343, 350, 116 S.Ct. 2174, 2179, 135 L.Ed.2d 606. In *Lujan v. Defenders of Wildlife,* the Supreme Court outlined the requirements necessary to satisfy standing:

The irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized ... and (b) actual or imminent not conjectural or hypothetical ... Second, there must be a causal connection between the injury and the conduct complained of ... Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan,* at 560–61, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (quotations omitted). The party invoking federal jurisdiction bears the burden of proof in establishing all three elements. *Id.* at 561, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351. "Failure to establish any one [of them] deprives the federal courts of jurisdiction to hear the suit." *Rivera v. Wyeth–Ayerst Labs.,* 283 F.3d 315, 319 (5th Cir.2002). Standing is an indispensable part of the plaintiff's case. Accordingly, "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of litigation." *Parents for Educational Justice v. Picard,* 2000 WL 526864, *2 (E.D.La.2000), *citing Lujan,* 504 U.S. at 561, 112 S.Ct. at 2136–37. At the pleading stage, general factual allegations of injury resulting from defendants' conduct may suffice. *See Lujan,* 504 U.S. at 561, 112 S.Ct. at 2136–37; *Picard,* 2000 WL 526864 at *2.

The Fifth Circuit addressed the "injury in fact" prong of standing in *Public Citizen, Inc. v. Bomer,* 274 F.3d 212, 217–18. "[A]n injury in fact [is] an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.'" *Bomer,* 274 F.3d at 217–18, *citing Lujan.* at 560, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351; *see City of Los Angeles v. Lyons,* 461 U.S. 95, 101–02, 103 S.Ct. 1660, 75 L.Ed.2d 675, (1983) ("The plaintiff must show that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." (citations omitted)); *see also Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) ("[A] party who invokes the court's authority [must] show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant" (internal quotation marks omitted)).

In addition to the constitutional elements, courts must consider three "prudential concerns":

(1) whether the plaintiff's complaint falls within the zone of interest protected by the statute or constitutional provision at issue;

(2) whether the complaint raises abstract questions amounting to generalized grievances which are more appropriately resolved by the legislative branches; and

(3) whether the plaintiff is asserting his or her own legal rights and interests rather than the legal rights and interests of another.

*Murray v. City of Austin,* 947 F.2d 147, 151 (5th Cir.1991), *cert. denied,* 505 U.S. 1219, 112 S.Ct. 3028, 120 L.Ed.2d 899

(1992); *Picard*, 2000 WL 526864 at *2. These "prudential concerns" often overlap with the constitutional elements.

 A standing challenge under Federal Rule of Civil Procedure 12(b)(1) may be characterized as either a "facial attack" or a "factual attack." According to *Paterson v. Weinberger*, 644 F.2d 521 (5th Cir.1981), if a defendant merely files a Rule 12(b)(1) motion without supporting it with documentary evidence, a "facial attack" on standing, the trial court must look to the sufficiency of the allegations in the complaint because they are presumed to be true. *Id.* at 523. If those jurisdictional allegations support subject matter jurisdiction, the complaint stands. *Id.See also Barrett v. Johnson Controls, Inc.*, 2003 WL 21500400 (N.D.Tex.2003). In making a "factual attack" upon the court's subject matter jurisdiction, the defendant submits "affidavits, testimony, or other evidentiary materials." *Paterson*, 644 F.2d at 523. "In the latter case a plaintiff is also required to submit facts through some evidentiary method and has the burden of proving by a preponderance of the evidence that the trial court does have subject matter jurisdiction." *Id.* In that case, courts do not presume the truth of the plaintiff's allegations, and the "plaintiff is obliged 'to submit facts through some evidentiary method' to sustain his burden." *Irwin v. Veterans Administration*, 874 F.2d 1092, 1096 (5th Cir.1989) (citing *Paterson*, 644 F.2d at 523); *Barrett*, 2003 WL 21500400 at *3.

### 2. *Ripeness*

 A dispute is ripe only where an "actual controversy" exists. *Shields v. Norton*, 289 F.3d 832, 835 (5th Cir.2002) (citing 28 U.S.C. § 2201(a)); *Leclerc v. Webb*, 270 F.Supp.2d 779, 787 (E.D.La. 2003). Ripeness separates those matters that are premature because the injury is speculative and may never occur from those that are appropriate for judicial re-

view. *United Transportation*, 205 F.3d at 857 (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *overruled on other grounds, Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977)). A case is generally ripe if any remaining questions are purely legal ones. *Id.* (quoting *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 833 F.2d 583, 586–87 (5th Cir. 1987)). Conversely, a case is not ripe if further factual development is required. *Id.* When challenging a statute or rule, ripeness may require that the rule be evaluated in light of a particular situation rather than a hypothetical one. *See Texas v. United States*, 523 U.S. 296, 301, 118 S.Ct. 1257, 1260, 140 L.Ed.2d 406 (1998). Because both standing and ripeness analyses look to the existence of actual injury to the plaintiff caused by the alleged wrong, they overlap to some degree and often collapse into each other. Standing may be distinguished from ripeness, however, because where standing is at issue the question regarding the existence of an actual injury arises from the identity of the parties rather than-as here the non-occurrence of events in the causal chain which may or may not occur. *Hallandale Professional Fire Fighters Local 2238 v. City of Hallandale*, 922 F.2d 756, 760 n. 3 (11th Cir. 1991).

### III. ANALYSIS

Defendant Reed Elsevier's motion presents a two-pronged argument for dismissing plaintiffs' DPPA claims:

(1) Rule 12(b)(1) mandates dismissal for lack of subject matter jurisdiction because plaintiffs lack standing as to her DPPA claims; and

(2) Rule 12(b)(6) dismissal for failure to state a claim upon which relief can be granted applies to plaintiffs' DPPA improper obtainment claims.

Additionally, the Court raises, *sua sponte*, the issue of ripeness as it pertains to plain-

tiffs' DPPA claims. This Court generally discusses Article III case-or-controversy issues at the outset of its rulings; however, in the instant matter the Court will analyze plaintiffs' obtainment claim before addressing standing and ripeness because the Court's interpretation of the DPPA delineates the scope of plaintiffs' potential injuries-in-fact under the Act.

*A. DPPA Obtainment under Rule 12(b)(6)*

 The Court agrees with defendant Reed Elsevier that plaintiffs may not maintain a DPPA claim for improper obtainment under 18 U.S.C. § 2724(a) without alleging an accompanying impermissible use. The plain language of the DPPA permits entities like Reed Elsevier to obtain drivers' personal information from DMVs and subsequently resell that information to third parties with a permissible use.

 When interpreting a statute, courts must begin with an analysis of the statute's actual words because when "the language of the federal statute is plain and unambiguous, it begins and ends [the court's] inquiry." *United States v. Osborne*, 262 F.3d 486, 490 (5th Cir.2001). The court may only refer to legislative history for congressional intent when the statute is unclear or ambiguous. *Free v. Abbott Laboratories*, 51 F.3d 524, 528 (5th Cir.1995). "[A]s in any case of statutory interpretation, we look to the plain language of the statute, reading it as a whole and mindful of the linguistic choices made by Congress." *In re Universal Seismic Assocs.*, 288 F.3d 205, 207 (5th Cir.2002) (quoting *Whatley v. Resolution Trust Corp.*, 32 F.3d 905, 909 (5th Cir.1994)). Statutory language reflects the intention of Congress, and "Congress' intention is the law and must be followed." *Blue Cross & Blue Shield v. Shalala*, 995 F.2d 70, 73 (5th Cir.1993).

 The language of 18 U.S.C. § 2721(c) permitting resale and redisclosure by "authorized recipients" instead of "authorized users" or "permissible users" indicates Congress' anticipation that entities such as Reed Elsevier would obtain drivers' personal information from DMVs strictly to redistribute it to persons with permissible uses. Because the DPPA neglects to define "authorized recipient," the Court must look to the words' ordinary meaning for guidance. "In all cases involving statutory construction, [the court's] starting point must be the language employed by Congress, ... and [the court] assume[s] that the legislative purpose is expressed by the ordinary meaning of the words used." *INS v. Phinpathya*, 464 U.S. 183, 189, 104 S.Ct. 584, 589, 78 L.Ed.2d 401 (1984). "The canons of statutory construction dictate that when construing a statute, the court should give words their ordinary meaning and should not render as meaningless the language of the statute." *White v. Black*, 190 F.3d 366, 368 (5th Cir.1999). Dictionaries provide a "principle source for ascertaining the ordinary meaning of statutory language." *Thompson v. Goetzmann*, 337 F.3d 489, 498 n. 20 (5th Cir.2003).

"Recipient," as commonly defined in dictionaries, is not synonymous with "user." "Recipient" is generally defined as "one that receives" or "[a] person who or thing which receives something." *Webster's Third New International Dictionary Unabridged* (3rd Ed.1993); *The American Heritage Dictionary of the English Language* (4th Ed.2000). "User" means "one that uses." *Webster's Third New International Dictionary; The American Heritage Dictionary*. One "receives" by "tak[ing] ... [or] acquir[ing]" and "uses" by "put[ting] into service" *The American Heritage Dictionary*. Clearly, the two terms have separate meanings, as Congress knew well when it drafted the DPPA. Any interpreta-

tion of "authorized recipient" to mean "authorized user" runs afoul of the words' common definitions and, in effect, renders the term "recipient" meaningless under the DPPA.

The term "authorized" is defined as "marked by authority ... [or] sanctioned by authority" *Webster's Third New International Dictionary.* "Authorize" means "to endorse, empower, justify, or permit by or as if by some recognized or proper authority" or "[t]o give permission for ... [or to] sanction." *Webster's Third New International Dictionary; The American Heritage Dictionary. The American Heritage Dictionary* supplements the above definition of "authorize" with the following example of its usage: "city agency that authorizes construction projects." (emphasis omitted). The definitions of "authorize" and "authorized" make clear that the terms are commonly used in reference to a grant of permission by a state or municipal agency. This common usage would apply to a DMV resale authorization just as it would a city council construction authorization. It is doubtful that Congress employed the term "authorized" to refer to the DPPA directly sanctioning a recipient because the Act otherwise speaks in terms of "use" rather than "user" and it provides no process or guidelines for authorization. More likely, Congress intended to leave the recipient authorization process to the states and their DMVs.

Congress could have limited resale and redisclosure to "permissible users," keeping in line with 18 U.S.C. § 2721(b)'s theme of permissible use, but instead Congress employed the term "authorized recipient" in § 2721(c). This deliberate word choice reveals congressional intent to allow states and their DMVs to authorize persons and entities to receive drivers' information for resale. In enacting the DPPA, Congress intended to strike "a critical balance between legitimate governmental and business needs for this information, and the fundamental right of our people to privacy and safety." 139 Cong. Rec. S15, 763 (1993). Congress was well aware of the economic value of DMV records and of the common state practice of selling drivers' personal information to private resellers. The inclusion of the term "authorized recipient" and the exclusion of any reference to "users" in DPPA § 2721(c) indicates an intent on behalf of Congress to delegate authorization to the states and thereby permit personal information resellers like Reed Elsevier who are authorized by the state or its DMV to obtain drivers' personal information for the purpose redistribution to persons with "permissible uses."

The plain language of the DPPA is written in terms of permissible "uses" rather than permissible "users."[1] Defendant contends that this congressional lin-

---

1. 18 U.S.C. § 2721(b) provides in pertinent part:

> Permissible *uses.*—Personal information referred to in subsection (a) shall be disclosed for *use* in connection with matters of motor vehicle or driver safety ... and, subject to subsection (a)(2), may be disclosed as follows:
> (1) For *use* by any government agency ... in carrying out its functions ...
> (2) For *use* in connection with matters of motor vehicle or driver safety ...
> (3) For *use* in the normal course of business ...

> (4) For *use* in connection with any civil, criminal, administrative, or arbitral proceeding ...
> (5) For *use* in research activities ...
> (6) For *use* by any insurer ... in connection with claims investigation activities ...
> (7) For *use* in providing notice to the owners of towed or impounded vehicles ...
> (8) For *use* by any licensed private investigative agency ... for any purpose permitted ...
> (9) For *use* by an employer or its agent or insurer to obtain or verify information ...

guistic choice, among others, reveals an intent to allow companies like Reed El-sevier to obtain and resell drivers' personal information to parties with a permissible use under the DPPA. The Court agrees. Congress' intent to regulate the use of drivers' personal information rather than the user is evident from its DPPA word choice as well as the language it employed in several other privacy-related statutes. If Congress had intended to require that the "authorized recipient" of personal information also be a user of that information, it could have written the DPPA exceptions explicitly to that effect. Congress could have referred to "permissible users" rather than "permissible uses" in 18 U.S.C. § 2721(b). Instead, Congress opted to describe DPPA disclosure exceptions in terms of use.

Indeed, in other privacy acts Congress has restricted disclosure exceptions to specific users. For example, in the 1998 Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq.*, Congress wrote:

A video tape service provider *may disclose personally identifiable information concerning any consumer—*

(10) For *use* in connection with the operation of private toll transportation facilities.
(11) For any other *use* . . . if the State has obtained the express consent . . .
(12) For bulk distribution . . . if the State has obtained the express consent . . .
(13) For *use* by any requester, if the requester demonstrates it has obtained the written consent . . .
(14) For any other *use* specifically authorized . . . if such use is related to . . . public safety.
18 U.S.C. § 2721(b) (emphasis added).

**2.** 20 U.S.C. § 1232g(b)(1) provides in relevant part:

*No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records (or personally identifiable information contained therein* other than

(A) *to the consumer;*
(B) *to any person* with the informed, written consent . . .
(C) *to a law enforcement agency* . . .
(D) *to any person* if the disclosure is solely of the names and addresses . . .
(E) *to any person* if the disclosure is incident to the ordinary course of business . . .

18 U.S.C. § 2710(b)(2) (emphasis added). Similarly, in the Family Education Rights Privacy Act, U.S.C. § 1232g, *et seq.*, Congress explicitly limited personal information release to school officials, teachers, authorized federal representatives, state and local officials, parents, and others, rather than merely regulating the types of use those persons might undertake. 20 U.S.C. § 1232g(b)(1).[2] Also, in the 1974 Privacy Act, 5 U.S.C. § 552a(b), Congress selected language that specifically provided for disclosures to certain users or types of users:

Conditions of disclosure.—*No agency shall disclose any record* which is contained in a system of records by any means of communication to any person,

directory information, as defined in paragraph (5) of subsection (a) of this section) of students without the written consent of their parents to any individual, agency, or organization, *other than to the following—*
(A) other *school officials,* including *teachers* . . .
(B) *officials of other schools* . . .
(C)(i) *authorized representatives* of (I) the Comptroller General of the United States . . .
(D) in connection with a student's application for, or receipt of, financial aid;
(E) *State and local officials* . . .
(F) *organizations conducting studies* . . .
(G) *accrediting organizations* . . .
(H) *parents* . . .
(I) . . . in connection with an emergency . . .
(J) . . . *entity or persons* designated in a Federal grand jury subpoena . . .
20 U.S.C. § 1232g(b)(1)(emphasis added).

or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, *unless disclosure of the record would be—*

(1) *to those officers and employees* of the agency which maintains the record who have a need for the record in the performance of their duties;

(2) required under section 552 of this title;

(3) for a routine use as defined in subsection (a)(7) of this section and described under subsection (e)(4)(D) of this section;

(4) *to the Bureau of the Census* for purposes of planning or carrying out a census or survey or related activity pursuant to the provisions of title 13;

(5) *to a recipient* who has provided the agency with advance adequate written assurance that the record will be used solely as a statistical research or reporting record, and the record is to be transferred in a form that is not individually identifiable;

(6) *to the National Archives and Records Administration* as a record which has sufficient historical or other value to warrant its continued preservation by the United States Government, or for evaluation by the Archivist of the United States or the designee of the Archivist to determine whether the record has such value;

(7) *to another agency* or to an instrumentality of any governmental jurisdiction within or under the control of the United States for a civil or criminal law enforcement activity if the activity is authorized by law, and if the head of the agency or instrumentality has made a written request to the agency which maintains the record specifying the particular portion desired and the law enforcement activity for which the record is sought;

(8) *to a person* pursuant to a showing of compelling circumstances affecting the health or safety of an individual if upon such disclosure notification is transmitted to the last known address of such individual;

(9) *to either House of Congress,* or, to the extent of matter within its jurisdiction, any committee or subcommittee thereof, any joint committee of Congress or subcommittee of any such joint committee;

(10) *to the Comptroller General,* or any of his authorized representatives, in the course of the performance of the duties of the General Accounting Office;

(11) pursuant to the order of a court of competent jurisdiction; or

(12) *to a consumer reporting agency* in accordance with section 3711(e) of title 31.

5 U.S.C. § 552a(b) (emphasis added). The aforementioned privacy acts make clear that, upon drafting the DPPA, Congress knew how to write a privacy statute that limited disclosures to certain privileged persons, or users. However, Congress instead chose to limit Drivers' personal information disclosures to certain types of use.

Plaintiffs' reliance on the Iowa Supreme Court opinion in *Locate.Plus.Com, Inc. v. Iowa D.O.T,* 650 N.W.2d 609, 617–18 (Iowa 2002), is misplaced. *Locate.Plus.Com* does not bind this Court. That decision is both factually and procedurally distinguishable from the case at hand. Furthermore, *Locate.Plus.Com* neglects to provide a meaningful analysis of the DPPA's statutory language and corresponding congressional intent, especially as they relate the common definitions of key DPPA terms and to other federal privacy acts. As a result, the *Locate.Plus.Com* holding cannot apply to the instant plaintiffs' improper obtainment claims, which must be dismissed.

Locate.Plus.com, Inc. is a licensed private investigation agency who resells DMV information to law enforcement agencies and other persons and entities who utilize the information in the course of their work. *Locate.Plus.Com*, 650 N.W.2d at 611. When Locate.Plus.com, Inc. requested DMV records from the Iowa Department of Transportation, the department refused to release the records, maintaining that Locate.Plus.com, Inc. was not entitled to the personal information under the DPPA and similar Iowa law. *Id.* Locate.Plus.com, Inc. brought a declaratory judgment action against Iowa seeking judicial review of the information refusal. The district court affirmed the decision of the Iowa Department of Transportation, as did the Iowa Supreme Court. *Id.* The *Locate.Plus.Com* court stated:

> The language of the DPPA as a whole makes it plain that Congress and, in turn, our legislature, sought to limit access to personal information in state motor vehicle records by both protecting citizens from the improper use of such information, while allowing access for legitimate purposes or uses. At the same time, it imposed a gatekeeping function on the state departments of motor vehicles to exercise discretion to disclose personal information when used for the purposes described in subsection (b). Thus, disclosure essentially depends on the use sought for the information, and the states are charged with the responsibility to ensure that disclosure is limited to those circumstances where Congress determined that the use for the information trumps the competing privacy interest ... We think this approach taken by Congress to the dissemination of personal information in motor vehicle records contemplates that the person or entity requesting disclosure of the personal information also be the person or entity that will use the information for the statutory purpose. Thus,

nonconsensual disclosure of information is permitted only for approved uses, and disclosure is not permitted if the requester is not seeking to use the information for the statutory purpose. The statute does not permit disclosure to a nonuser, who only seeks information to redisclose it for use under a permitted purpose. *Id.* at 616–17.

The Iowa Supreme Court accurately observed that Congress enacted the DPPA to protect citizens from improper use of personal DMV information while allowing access for legitimate purposes. However, the *Locate.Plus.Com* court failed to fully consider the plain language Congress employed in drafting the DPPA. The Iowa court held that a private reseller "must itself be an 'authorized user'" to be permitted access to DMV records. *Locate.Plus.Com*, 650 N.W.2d at 618. That court insinuated that the "authorized user" requirement of the DPPA meant that "the person or entity requesting disclosure of the personal information also be the person or entity that will use the information for the statutory purpose." *Id.* at 617. However, the term "authorized user" does not appear in the DPPA. Rather, as mentioned above, Congress employed the term "authorized recipient" in reference to permissible resale and distribution. The *Locate.Plus.Com* decision's mandate that DMV information resellers be "authorized users" ignores the plain language of the DPPA and the common usages of its chosen terms. As discussed previously, "recipient" does not mean "user." *Locate.Plus.Com's* conclusion that "authorized recipient" means "authorized user" under the DPPA erroneously renders meaningless the term that Congress chose, "authorized recipient."

The Iowa Supreme Court's DPPA interpretation also belies congressional intent. As discussed above, Congress has opted to

regulate personal information "users" on several occasions, such as the Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq.*, the Family Education Rights Privacy Act, U.S.C. § 1232g, *et seq.*, and the 1974 Privacy Act, 5 U.S.C. § 552a(b), *et seq.* *Locate.Plus.Com* characterizes the DPPA as an act that regulates uses and users, however, it failed to recognize that the Act overwhelmingly regulates uses. This distinction from numerous privacy acts that regulate end users, along with the DPPA's plain reference to "authorized recipients," provides a clear intent by Congress to permit resale by recipients authorized by the state or its DMV.

Finally, the *Locate.Plus.Com* decision mistakenly concludes that "any other interpretation would render the statute impractical, and essentially render the state incapable of performing its gatekeeping function under the statute." *Locate.Plus.Com*, 650 N.W.2d at 617. This reasoning again ignores the plain language of the statute and also overlooks the import of the DPPA enforcement provisions and the information refusal discretion afforded DMVs under the Act. DPPA § 2721(c) requires any "authorized recipient" to maintain records documenting the identity and permitted uses for which drivers' resold personal information will be used. Sections 2723–2724 further demonstrate that Congress intended for persons and entities other than states to act as gatekeepers by including a private right of action against the violator. Such a private right of action would not be necessary if Congress had sought to limit gatekeeping to states. Also, unlike the mandatory disclosure sought in the *Locate.Plus.Com* declaratory judgment action, the instant dispute does not hinder the state's gatekeeping role because the permissive language of 18 U.S.C. § 2721(b)(1–14) vests the state with vast discretion regarding the initial disclosure of DMV records. Unlike *Lo-*

*cate.Plus.Com,* the situation at bar involves a state voluntarily disclosing information to a business the state authorizes to possess and redisclose DMV information. In effect, the state has already performed its gatekeeping role without hindrance and has opted to authorize Reed Elsevier for receipt. Also, the *Locate.Plus.Com* rationale provides no greater gatekeeping role to the state. Indeed, that decision limits, rather than empowers, the state as a gatekeeper in the instant procedural context. In either case, the state is one step removed from the resale process. The DPPA gatekeeper has no more control over a direct user reseller than nonuser reseller such as Reed Elsevier.

Plaintiffs also cite to language in *Reno v. Condon,* 528 U.S. 141, 120 S.Ct. 666 (2000), to support her claim. *Reno* upheld the constitutionality of the DPPA, but the issue of improper obtainment was not before the court. In *Reno,* the Supreme Court focused on the principles of federalism and the Tenth Amendment, not on the precise meaning and scope of the statute, and certainly not as applied to the facts in this case. This Court finds plaintiffs' reliance on *Reno* to be unavailing.

For reasons stated above, plaintiffs' DPPA improper obtainment claims must be dismissed pursuant to Rule 12(b)(6). Defendant's obtainment of plaintiffs' personal DMV records for the sole purpose of resale and redisclosure does not entitle plaintiff to relief under the DPPA.

### B. Article III Case–or–Controversy under Rule 12(b)(1)

#### 1. Standing

Defendant Reed Elsevier avers that plaintiffs' DPPA claims must be dismissed pursuant to Fed.R.Civ.P. 12(b)(1) because plaintiffs fail to meet the jurisdictional and constitutional requirements of

standing. Essentially, defendant argues that plaintiffs lack the evidence necessary to prove that:

> (1) they have suffered an "injury in fact"-an invasion of a legally protected interest which is
>
>> (a) concrete and particularized and
>>
>> (b) actual and imminent (not conjectural or hypothetical);
>
> (2) the injury is traceable to defendant's challenged action; and
>
> (3) it is likely (not merely speculative) that the injury will be redressed by a favorable decision.

*See Lujan v. Defenders of Wildlife*, 504 U.S. at 560–61, 112 S.Ct. at 2136.

Defendant has presented the Court with a "factual attack" on standing under *Paterson v. Weinberger* by attaching affidavits and other evidentiary materials to its motion. *Paterson*, 644 F.2d at 523. Consequently, the Court cannot presume the truth of plaintiffs' allegations in determining whether Russell has met her standing burden. *Irwin v. Veterans Administration*, 874 F.2d at 1096. Instead, the Court shall analyze the manner and degree of evidence appropriately provided at this stage of litigation. *See Parents for Educational Justice v. Picard*, 2000 WL 526864 *2.

Defendant supports its motion with numerous affidavits and documentary evidence. The affidavits of Spiro Colias (LexisNexis Director of CFM Customer Intelligence), David Noll (LexisNexis Senior Software Engineer), and Brian Wolter (LexisNexis Lead Technical Analyst) indicate that LexisNexis retains information from all searches of its systems containing DMV records, including information to determine whose DMV records were accessed. These affidavits suggest further that the only person to whom defendant disclosed plaintiffs' personal DMV records was plaintiffs' counsel. The record is unclear as to how plaintiffs' counsel went about obtaining the information and as to the degree of caution defendant employed in redisclosing the information. According to defendant, the evidence presented reveals that plaintiffs have not met their standing requirements of injury in fact, causal connection, or redressability.

Plaintiffs rebut Reed Elsevier's affidavits with an affidavit of plaintiffs' counsel indicating that she obtained personal DMV information pertaining to each plaintiff. This declaration is corroborated by attached LexisNexis printouts revealing plaintiffs personal DMV records. Again, plaintiffs furnish no details regarding the procedure plaintiff's counsel undertook to obtain the information or the scrutiny defendant applied to her in determining her role as a permissible user. Also, plaintiffs offered no evidence of their information being resold or redistributed to any other third parties.

Based on the limited evidence presented in support of and in opposition to this motion, this Court finds that plaintiffs have failed to satisfy their standing burden of proving "injury in fact." Except for the redisclosure of DMV information to their attorney, plaintiffs have presented no evidence that their personal information was either used or resold by defendant in violation of the DPPA. Excluding counsel's isolated information obtainment, plaintiffs have omitted any evidence indicating that their injuries are actual or imminent. Plaintiffs do not seem from the facts presented to be immediately in danger of sustaining direct injury under the DPPA. They have not submitted proof that defendant is on the verge of redisclosing their personal information to unauthorized recipients or illicit users. Rather, plaintiffs claims are conjectural, hypothetical, and tenuous at best.

 Plaintiffs suggest the Court allow discovery to remedy their evidentiary

shortfall. However, this Court is reluctant to embark upon a litigious fishing expedition. "Discovery is not intended as a fishing expedition permitting the speculative pleading of a case first and then pursuing discovery to support it; the Plaintiff must have some basis in fact for the action." *Zuk v. Eastern Pa. Psychiatric Inst. of the Med. College,* 103 F.3d 294, 299 (3d Cir. 1996). "The discovery rules are designed to assist a party to prove a claim it reasonably believes to be viable without discovery, not to find out if it has any basis for a claim." *Micro Motion, Inc. v. Kane Steel Co.,* 894 F.2d 1318, 1327 (citing *Netto v. Amtrak,* 863 F.2d 1210, 1216 (5th Cir. 1989)). The instant case presents a scenario where plaintiffs have presented minimal evidence of an injury in fact. This Court shall not permit plaintiffs to use discovery to create a factual basis for standing. The Court will, however, allow plaintiffs an opportunity to better present their existing evidence in support of standing. That relief is discussed *infra.*

2. *Ripeness*

■ Although defendant Reed Elsevier refrained from arguing ripeness, the Court nonetheless questions, *sua sponte,* whether this matter is mature to proceed. The lack of a clear, actual injury, as well as the need for further factual development, indicates that ripeness bear addressing. As noted by the Fifth Circuit, "[t]he general rule for determining whether ripeness exists is easy to state and hard to apply." *International Tape Mfrs. Assn. v. Gerstein,* 494 F.2d 25, 27 (5th Cir.1974). "The central concern of ripeness is whether the case involves uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." Wright, Miller & Cooper, at § 3532. Plaintiffs have so far omitted evidence that would put to rest the Court's concerns about the uncertainty and contingency of future events anticipated in plaintiffs

DPPA claims. Plaintiffs suggestion that discovery is needed to support the imminency of their injuries suggests to the Court that further factual development is necessary before this case ripens.

Based on the facts presented, this Court cannot conclude that plaintiffs' DPPA claims against defendant are ripe for adjudication. As is the case with standing's "injury in fact" requirement, the ripeness prerequisite of actual injury hinders plaintiffs' advancement of their claims. However, because the parties have not yet briefed ripeness and because the evidence presented thus far in support of standing is wanting, this Court shall afford plaintiffs one more opportunity to demonstrate an Article III "case" or "controversy." Plaintiffs shall have until February 20, 2004, to amend their Complaint to alleviate standing and ripeness deficiencies and to submit evidence supporting case-or-controversy elements pertaining to their DPPA claims. Defendant shall be permitted to object to standing or ripeness by motion filed on or before March 2, 2004. Plaintiffs shall file an opposition to any such motion by March 10, 2004, and the Court shall hear the motion on March 17, 2004, or as soon thereafter as possible. Because both parties have already briefed standing, the Court discourages duplicative memoranda on that issue. Accordingly,

**IT IS ORDERED** that defendant's Rule 12(b)(6) Motion to Dismiss (Rec.Doc. No. 21) for failure to state a claim upon which relief can be granted is hereby **GRANTED** and plaintiffs' DPPA claims against defendant Reed Elsevier for improper obtainment of personal information are hereby **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that defendant's Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction is hereby **GRANTED** and plaintiffs' remaining DPPA claims against defendant Reed

Elsevier are hereby **DISMISSED WITH PREJUDICE**