HOUSTON, Justice
(concurring specially).
In opposition to the applications for rehearing, the Birmingham News Company filed an excellent brief, which I quote from and adopt as part of my special concurrence:
“[The Supreme Court of Alabama’s majority opinion] fits within the broad general category of cases that recognize the authority of Congress to regulate persons or things that are in some sense participating ‘in’ interstate commerce. See Reno v. Condon, 528 U.S. 141, 120 S.Ct. 666, 145 L.Ed.2d 587 (2000); United States v. Lopez, 514 U.S. 549, 557, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (‘Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities’) (emphasis added); Lawrence H. Tribe, American Constitutional Law, § 5-5, at 826 (3d ed.2000) (‘[although the Court might more comfortably have described it as a separate category, Lopez located the regulation of “persons or things ‘in’ interstate commerce,” or “participating in” such commerce, in the instrumentalities branch of the Court’s Commerce Clause doctrine’). The analysis or test described in Sisters of the Visitation does not apply to cases like this one, where the actual persons and things involved are themselves within the flow of commerce. See Gulf Oil Corp. v. Copp Paving Co., 419 U.S. 186, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974) (which defined ‘in commerce’ as related to the ‘flow1 and defining the ‘flow5 to include ‘the practical, economic continuity in the generation of goods and services for interstate markets and their transport and distribution to the consumer’). Such persons and things, by definition, substantially affect — because they are components of — interstate commerce. See Lawrence H. Tribe, American Constitutional Law, § 5-5, at 827 (3d ed.2000).
“Judicial recognition of a ‘flow’ of interstate commerce is not new. In 1905, Justice Holmes wrote as follows:
“ ‘[C]ommerce among the States is not a technical legal conception, but a practical one, drawn from the course of business. When cattle are sent for sale from a place in one State, with the expectation that they will end their transit, after purchase, in another, and when in effect they do so, with only the interruption necessary to find a purchaser at the stock yards, and when this is a typical, constantly recurring course, the cun"ent thus existing is a current of commerce among the States, and the purchase of the cattle is a part and incident of such commerce.’
*475 “Swift & Co. v. United States, 196 U.S. 375, 399, 25 S.Ct. 276, 49 L.Ed. 518 (1905) (emphasis added). In 1943, in an opinion by Justice Douglas, the United States Supreme Court again discussed the movement of goods in a ‘current’ of interstate commerce and the authority of Congress to regulate ⅜ as well as those who participate in it. Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460 (1943). In Walling, the Court found that the flow of interstate commerce did not necessarily cease once goods were delivered to a wholesaler located in the state of destination:
“ ‘It is clear that the purpose of the [Fair Labor Standards Act] was to extend federal control in this field throughout the farthest reaches of the channels of interstate commerce. There is no indication ... that, once the goods entered the channels of interstate commerce, Congress stopped short of control over the entire movement of them until their interstate journey was ended. No ritual of placing goods in a warehouse can be allowed to defeat that purpose. The entry of the goods into the warehouse interrupts but does not necessarily terminate their interstate journey. A temporary pause in their transit does not mean that they are no longer ‘in commerce’ within the meaning of the Act. As in the case of an agency ... if the halt in the movement of the goods is a convenient intermediate step in the process of getting them to their final destinations, they remain ‘in commerce’ until they reach those points. Then there is a practical continuity of movement of the goods until they reach the customers for whom they are intended. That is sufficient. Any other test would allow formalities to conceal the continuous nature of the interstate transit which constitutes commerce.’
“Walling v. Jacksonville Paper Co., 317 U.S. 564, 567-68, 63 S.Ct. 332, 87 L.Ed. 460 (1943). Finding'that the wholly intrastate delivery of various paper products (including newsprint) was subject to Congressional regulation, the Court held that the products remained ‘in commerce’ because they had been ordered pursuant to preexisting contracts or understandings with customers. Under such circumstances,
“ ‘a break in their physical continuity of transit is not controlling. If there is a practical continuity of movement from the manufacturers or suppliers without the state, through respondent’s warehouse and on to customers whose prior orders or contracts are being filled, the interstate journey is not ended by reason of a temporary holding of the goods at the warehouse. The fact that respondent may treat the goods as stock in trade or the circumstance that title to the goods passes to respondent on the intermediate delivery does not mean that the interstate journey ends at the warehouse. The contract or understanding pursuant to which goods are ordered, like a special order, indicates where it was intended that the interstate movement should terminate.’
“317 U.S. at 568-69, 63 S.Ct. 332. Walling stands for the proposition that temporary stops in an interstate journey of merchandise to a predetermined destination do not necessarily interrupt the *476 ñow of commerce. See, e.g., Stewart Jordan Distrib. Co. v. Tobin, 210 F.2d 427 (5th Cir.), cert. denied, 347 U.S. 1013, 74 S.Ct. 866, 98 L.Ed. 1136 (1954).
“This Court’s decision of September 22[, 2000] is consistent with the principles described in Walling. The newspapers distributed by Stewart and Hyde were subject to preexisting orders in the form of subscriptions. Those subscriptions required that Stewart and Hyde deliver news, features, news magazines, and commercial advertising inserts (all of the ‘preprints, supplements, and inserts’ designated for delivery pursuant to their agreements) in a timely manner on the day of publication to the subscriber. Much of the news content, many of the photographs, and virtually all of the news magazines, special features, and commercial advertising inserts were published and prepared in their entirety outside of Alabama for distribution to the subscriber. As the United States Supreme Court found in Walling, the preexisting order — the subscription — by the ultimate subscriber ‘indicates where it is intended that the interstate movement should terminate.’ Walling v. Jacksonville Paper Co., 317 U.S. 564, 568-69, 63 S.Ct. 332, 87 L.Ed. 460 (1943). To find that the purpose for the production of such news and advertising was for it to be delivered to The News would be to ‘allow formalities to conceal the continuous nature of the interstate transit which constitutes commerce.’ 317 U.S. at 567-68, 63 S.Ct. 332.
“The conclusion reached in this case concerning the intrastate distribution of news, features, and commercial advertising moving in interstate commerce is consistent with the conclusions reached by other courts.* In 1998, for example, the United States District Court for the Middle District of Georgia found that district managers of a newspaper ‘engaged in’ interstate commerce when they delivered newspapers to readers. The court held that, because the newspapers contained supplements and other material printed outside of Georgia, the district managers became part of a ‘practical continuity of movement’ of interstate commerce when they delivered the newspapers to readers within Georgia. Webb v. Athens Newspapers, Inc., 999 F.Supp. 1464 (M.D.Ga.1998). In 1972, the United States District Court for the Central District of California found that a news dealer was an inseparable part of the flow of interstate commerce because the newspaper he distributed contained news, feature material, comics, and other information that had moved in interstate commerce. Dahl v. Hearst Corp., [No. 72-2107, December 13, 1972] (C.D.Cal.1972) [not published in F.Supp.]; see also Wirtz v. Universal Adver. Serv., 258 F.Supp. 542 (N.D.Okla.1966) (similar holding with respect to the distribution of advertising circulars, handbills, and similar printed matter).
“In summary, Stewart and Hyde have not pointed to any misapprehension of fact or law on the part of this Court. The opinion of September 22 is not at odds with Sisters of the Visitation, because this Court properly found that Stewart and Hyde were integral and inseparable parts of the flow of interstate commerce.

 "The decisions of the United States Supreme Court in Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951), and that of the [United States Court of Appeals for the] Third Circuit in Evening News Publishing Co. v. Allied Newspaper Carriers of New Jersey, 263 F.2d 715 (3d Cir.1959), cert. denied, 360 U.S. 929, 79 S.Ct. 1449, 3 L.Ed.2d 1544 (1959), are hardly the *477 relics that Stewart and Hyde would have this Court believe.”