**Henry H. HARTMAN, Petitioner**

v.

**DEPARTMENT OF CONSERVATION AND NATURAL RESOURCES, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Dec. 12, 2005.
Decided Feb. 16, 2006.

Barbara A. Darkes, Harrisburg, for petitioner.

Susan Wood, Harrisburg, for respondent.

BEFORE: FRIEDMAN, Judge, and LEAVITT, Judge, and McCLOSKEY, Senior Judge.

OPINION BY Judge LEAVITT.

Henry H. Hartman petitions for review of an adjudication of the Department of Conservation and Natural Resources (DCNR) denying his request for records with the names and addresses of registered snowmobile owners in Pennsylvania. Hartman requested this information under the statute commonly known as the Right–

to–Know Law.[1] At issue is whether DCNR may refuse the request because these records contain information the disclosure of which is prohibited by federal statute; would result in the loss of federal funding to the Commonwealth; and would violate the snowmobile registrants' privacy rights.

Hartman is the owner of Hartman Publishing Company, the publisher of the *Keystone Snowmobiler,* the official publication of the Pennsylvania State Snowmobile Association, Inc. (PSSA). On January 10, 2005, Hartman filed a Right–to–Know Record Request with DCNR, requesting the "[r]ecords of all persons and businesses who have paid monies for snowmobile registration in 2003, 2004, and 2005." Reproduced Record at 1a. (R.R. ____).[2] The request clarified that the only information desired was a list of names and addresses of all snowmobile registrants, preferably in electronic format. DCNR's Right–to–Know Law Official denied Hartman's request on two grounds: first, the identified records did not meet the general definition of a public record under the Right–to–Know Law; and second, they were exempted from disclosure under the Right–to–Know Law's personal security exception as well as by the privacy guarantee set forth in Article I, § 8 of the Pennsylvania Constitution. Thereafter, DCNR advised Hartman that disclosure of the requested information was also prohibited under the Driver's Privacy Protection Act of 1994, 18 U.S.C. §§ 2721–2725 (DPPA).

Hartman filed exceptions, and on May 31, 2005, DCNR's Exceptions Official issued a final determination concluding the information was not a public record under the Right–to–Know Law for three reasons. First, disclosure was prohibited under the DPPA. Second, disclosure would result in the loss of federal funding to the Commonwealth. Third, the benefits of public disclosure were outweighed by the registrants' privacy interest in their names and addresses. Hartman then sought this Court's review.

On appeal, Hartman raises five issues with respect to DCNR's denial of his request.[3] First, he contends that the names and addresses of persons registering their snowmobiles with DCNR are public records under the Right–to–Know Law. Second, he contends that the federal DPPA does not prohibit disclosure of the requested information because DCNR is not a "State department of motor vehicles" gov-

1. Act of June 21, 1957, P.L. 390, *as amended,* 65 P.S. §§ 66.1–66.9.

2. Prior to 2001, DCNR routinely provided the names and addresses of registrants informally to PSSA. This practice ended in 2001.

3. In *Martella v. Department of Transportation,* 841 A.2d 633, 635 n. 9 (Pa.Cmwlth.2004), we explained that prior to the General Assembly's 2002 amendments to the Right–to–Know Law, this Court's scope of review was whether the denial of access to public records was for just cause. *See Tribune–Review Publishing Company v. Department of Community and Economic Development,* 814 A.2d 1261, 1263 n. 2 (Pa.Cmwlth.2003). However, when the General Assembly amended the Law, it eliminated the just cause standard. In the absence of a scope of review from the General Assembly, and because *Martella* was an appeal from an administrative agency, we applied the standard set forth in Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704, notwithstanding Section 9 of the Right–to–Know Law, which states that the "provisions of 2 Pa.C.S. (relating to administrative law and procedure) shall not apply to this act." 65 P.S. § 66.9. We reasoned that the exclusion only applied to those chapters of the Administrative Agency Law relating to practice and procedure, *i.e.,* Chapter 5, and not the remaining chapters, in particular, Chapter 7 (relating to judicial review). Thus, our standard of review in this case is whether constitutional rights have been violated, whether an error of law has been committed or whether findings of fact are supported by substantial evidence. 2 Pa.C.S. § 704.

erned by the DPPA; the DPPA has no application to an agency such as DCNR. Third, Hartman contends disclosure of the information will not result in the loss of federal funding to the Commonwealth. Fourth, he contends that the names and addresses of registered snowmobile owners are not protected by the Pennsylvania Constitution's right to privacy, and, in any case, DCNR lacks standing to raise the privacy rights of others, *i.e.*, the snowmobile registrants. Fifth, Hartman contends that even if disclosure is not required under the Right–to–Know Law, DCNR is still permitted to release the information under the Governor's Office Management Directive 205.36 (relating to disclosure of information under the Right–to–Know Law), and it should do so.[4]

The Right–to–Know Law provides generally that "a public record shall be accessible for inspection and duplication by a requester in accordance with this act." Section 2(a) of the Right–to–Know Law, 65 P.S. § 66.2(a). "Public records" fall into two categories: (1) an account, voucher or contract dealing with the receipt or disbursement of funds by an agency, or (2) a minute, order or decision by an agency fixing personal or property rights. Section 1 of the Right–to–Know Law, 65 P.S. § 66.1. Certain reports, communications and "other paper" are exempted from the definition of public record. *Id.* They include:

any record, document, material, exhibit, pleading, report, memorandum or other paper, *access to* or the publication of *which is [1] prohibited,* restricted or forbidden *by statute law* or order or decree of court, or [2] which would operate to the prejudice or impairment of a person's reputation or personal security *or* [3] which *would result in the loss by the Commonwealth* or any of its political subdivisions or commissions or State or municipal authorities *of Federal funds.*

Section 1 of the Right–to–Know Law, 65 P.S. § 66.1 (emphasis added).

We consider, first, Hartman's central argument that the Exceptions Official erred in concluding that disclosure of the requested information is prohibited under the DPPA, thereby removing the information from the definition of "public record" under the Right–to–Know Law. The federally enacted DPPA generally prohibits any "State department of motor vehicles and any officer, employee, or contractor thereof" from "knowingly disclos[ing] or otherwise mak[ing] available to any person or entity personal information about any individual obtained by the department in connection with a motor vehicle record." 18 U.S.C. § 2721(a)(1).[5] Hartman argues that DCNR is not Pennsylvania's "State department of motor vehicles."

The Administrative Code of 1929 has established the Department of Transporta-

---

4. With respect to this fifth issue, Hartman merely states that DCNR has discretionary authority to release the requested information. He does not allege that DCNR abused its discretion by failing to do so. Presenting no issue for review, we decline to create one for Hartman.

5. The DPPA further defines "personal information" as any information "that identifies an individual, including an individual's photograph, social security number, driver identification number, *name, address* (but not the 5–digit zip code), telephone number, and medi-

cal or disability information." 18 U.S.C. § 2725(3) (emphasis added). A "motor vehicle record" is defined as "any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles." 18 U.S.C. § 2725(1). Snowmobiles and ATVs are considered "motor vehicles" under the Vehicle Code. *See Gallo v. J.C. Penney Casualty Insurance Company,* 328 Pa.Super. 267, 476 A.2d 1322, 1325 (1984).

tion, to regulate motor vehicles.[6] In contrast, DCNR was established with the "primary mission . . . to maintain, improve and preserve State parks, to manage State forest lands . . . [and] to provide information on Pennsylvania's ecological and geologic resources."[7] Hartman argues that merely tasking DCNR with the responsibility of issuing titles and registrations for all-terrain vehicles and snowmobiles under The Administrative Code of 1929[8] and Chapter 77 of the Vehicle Code, 75 Pa.C.S. § 7711.1 (registration of snowmobiles by

DCNR), did not transform DCNR into a state department of motor vehicles.[9] Accordingly, DCNR is not prohibited under the DPPA from disclosing the names and addresses of the snowmobile registrants, and it will not lose federal funds if it discloses the requested information.

■ We need not address the narrow issue of whether DCNR is a "State department of motor vehicles" under the DPPA because DCNR has been made subject to the DPPA by another federal statute. The Transportation Equity Act for the

---

6. Section 2001 of the Act of April 9, 1929, P.L. 177, *as amended,* 71 P.S. § 511. It provides, in relevant part:

The Department of Transportation shall, subject to any inconsistent provisions in this act contained, exercise the powers and perform the duties by law vested in and imposed upon the said department, the Secretary of Transportation, the former State Highway Department, former State Highway Commissioner, the former Department of Highways, the former Secretary of Highways, those powers and duties relating to certificates of title, licensing of operators, registration of motor vehicles, tractors, trailers and semi-trailers, licensing of motor vehicles and tractors and exemptions and reciprocal agreements vested in and imposed upon the Department of Revenue and the Secretary of Revenue by the act of April 29, 1959 (P.L. 58), known as "The Vehicle Code," and its amendments . . .

7. The Act of June 28, 1995, P.L. 89 provides:
It is the intent of the General Assembly and the purpose of this act:
(1) To create a new Department of Conservation and Natural Resources to serve as a cabinet-level advocate for our State parks, forests, rivers, trails, greenways and community recreation and heritage conservation programs to provide more focused management of the Commonwealth's recreation, natural and river environments. The primary mission of the Department of Conservation and Natural Resources will be to maintain, improve and preserve State parks, to manage State forest lands to assure their long-term health, sustainability and economic use, to provide information on Pennsylvania's ecological and geologic

resources and to administer grant and technical assistance programs that will benefit rivers conservation, trails and greenways, local recreation, regional heritage conservation and environmental education programs across Pennsylvania.
71 P.S. § 1340.101(b)(1).

8. 71 P.S. § 1340.308 provides:

(c) Snowmobiles and ATV's.—[DCNR] shall have the powers and duties vested in the Department of Environmental Resources by 75 Pa.C.S. Ch. 77 (relating to snowmobiles and all-terrain vehicles).

9. The interpretation of the DPPA is a matter of federal law, and at least one court has held that a state's statutory scheme is not controlling. *See State of Oklahoma ex rel. Oklahoma Department of Public Safety v. United States,* 161 F.3d 1266, 1272 (10th Cir.1998). The meaning of "State department of motor vehicles" in the DPPA is a matter of Congressional intent. The general assumption is that "in the absence of a plain indication to the contrary, . . . Congress when it enacts a statute is not making the application of the federal act dependent on state law." *Jerome v. United States,* 318 U.S. 101, 104, 63 S.Ct. 483, 87 L.Ed. 640 (1943). One reason for this rule of construction is that federal statutes are generally intended to have uniform nationwide application. *Id.* A second reason for the presumption against the application of state law is the danger that "the federal program would be impaired if state law were to control." *Mississippi Band of Choctaw Indians v. Holyfield,* 490 U.S. 30, 44, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989) (citation omitted).

21st Century (TEA–21), Pub.L. No. 106–69, 113 Stat. 986, 1025–1026 (1999), makes any recipient of transportation funds subject to the terms of the DPPA, regardless of whether that person is a "State Department of motor vehicles." Section 350 of TEA–21 provides:

(a) No *recipient of funds made available in this Act* shall disseminate driver's license personal information as defined in 18 U.S.C. 2725(3) [including an individual's name and address] except as provided in subsection (b) of this section or motor vehicle records as defined in 18 U.S.C. 2725(1) for any use not permitted under 18 U.S.C. 2721.[10]

(emphasis added).[11] Because DCNR receives approximately $2,000,000 a year from the federal Department of Transportation under TEA–21, DCNR is subject to the terms of the DPPA.

◼ Hartman argues that even if the DPPA applies to DCNR, it authorizes the requested information in these circumstances. Hartman invokes a provision in Section 2721(b)(2) of the DPPA, which permits disclosure of otherwise protected personal information "for use in connection with matters of motor vehicle or driver safety …". 18 U.S.C. § 2721(b)(2). Hartman asserts that this exception applies because the September 2005 issue of the *Keystone Snowmobiler* contained articles to promote safety. We are not persuaded by Hartman's argument.

In construing a legislative enactment the court must ascertain and give effect to the legislative intention as expressed in the language employed. *Bonasi v. Board of Adjustment of Haverford Township*, 382 Pa. 307, 310, 115 A.2d 225, 226 (1955). In this matter, we must ascertain the intent of Congress in enacting the DPPA.

◼ The DPPA regulates the States' ability to sell personal information in the hands of a department of motor vehicles. *Reno v. Condon*, 528 U.S. 141, 144, 120 S.Ct. 666, 145 L.Ed.2d 587 (2000).[12] It

---

**10.** Subsection (b) of Section 350 provides:

(b) No recipient of funds made available in this Act shall disseminate a person's driver's license photograph, social security number, and medical or disability information from a motor vehicle record as defined in 18 U.S.C. 2725(1) without the express consent of the person to whom such information pertains, except for uses permitted under 18 U.S.C. 2721(1), 2721(4), 2721(6), and 2721(9): Provided, That subsection (b) shall not in any way affect the use of organ donation information on an individual's driver's license or affect the administration of organ donation initiatives in the States. 18 U.S.C. § 2721 contains those provision of the DPPA relating to permitted uses of "personal information" about registrants.

**11.** In 1998, Congress passed the Transportation Equity Act for the 21st Century (TEA–21), which authorized USDOT to expend funds for federal surface transportation programs during fiscal years 1998–2003. Prior to the expiration of TEA–21, the President signed into law the Surface Transportation Extension Act of 2003, Pub.L. No. 108–88, 117 Stat. 1110,

which extended the provisions of TEA–21 for an additional five months, through February 29, 2004. Two years later, Congress further extended the Act through passage of the Surface Transportation Extension Act of 2005, Pub.L. No. 109–14, 119 Stat. 324.

**12.** In *Reno*, 528 U.S. at 147, 120 S.Ct. 666, the United States Supreme Court upheld the DPPA against a challenge brought under the Tenth and Eleventh Amendments to the United States Constitution. The Court concluded that the *sale* of motor vehicle information was used "in the stream of interstate commerce by various public and private entities related to interstate motoring." *Id. Reno* has uncertain implications for Pennsylvania's regulation of snowmobile registrations. First, snowmobiles are not used in interstate motoring because they are not permitted to be operated on highways. Second, Pennsylvania is not engaged in the commerce of selling vehicle registrations in order to raise revenue. However, we need not reach the question of whether the DPPA can prevent a State from choosing to disclose the identity of snowmo-

prohibits the disclosure of "highly restricted personal information" without the "express consent" of that person, except in rare instances. 18 U.S.C. § 2721(a)(2).[13] The DPPA also prohibits the disclosure of "personal information," although the exceptions for disclosing "personal information" are far more numerous than for

bile registrants as a matter of public policy where it does so free of charge. Here, both parties presume that the DPPA is a type of "statute law" to which the General Assembly has chosen to defer in Section 1 of the Right-to–Know Law, 65 P.S. § 66.1.

13. The DPPA's prohibitions on the release and use of motor vehicle record information are as follows:

(a) **In general**—A State department of motor vehicles, and any officer, employee, or contractor thereof, shall not knowingly disclose or otherwise make available to any person or entitle:

(1) personal information, as defined in 18 U.S.C. 2725(3), about any individual obtained by the department in connection with a motor vehicle record, except as provided in subsection (b) of this section; or

(2) highly restricted personal information, as defined in 18 U.S.C. 2725(4), about any individual obtained by the department in connection with a motor vehicle record, without the express consent of the person to whom such information applies, except uses permitted in subsections (b)(1), (b)(4), (b)(6), and (b)(9): *Provided,* That subsection (a)(2) shall not in any way affect the use of organ donation information on an individual's driver's license or affect the administration of organ donation initiatives in the States.

18 U.S.C. § 2721(a).

14. It states:

In this chapter—

\* \* \*

(3) "personal information" means information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the 5–digit zip code), telephone number, and medical or disability information, but does not include

"highly restricted personal information." 18 U.S.C. § 2721(a)(2). The request here is for names and addresses, which fall into the category of "personal information." 18 U.S.C. § 2725.[14] Personal information may be disclosed to certain government agencies, without consent, and even to some businesses for limited purposes. 18 U.S.C. § 2721(b)(1)-(3).[15] Further, if the

information on vehicular accidents, driving violations, and driver's status.

(4) "highly restricted personal information" means an individual's photograph or image, social security number, medical or disability information; and

(5) "express consent" means consent in writing, including consent conveyed electronically that bears an electronic signature as defined in section 106(5) of Public Law 106–229.

18 U.S.C. § 2725.

15. 18 U.S.C. § 2721(b) provides in relevant part:

(b) Permissible uses—Personal information referred to in subsection (a) shall be disclosed for use in connection with matters of motor vehicle or driver safety and theft, motor vehicle emissions, motor vehicle product alterations, recalls, or advisories, performance monitoring of motor vehicles and dealers by motor vehicle manufacturers, and removal of non-owner records from the original owner records of motor vehicle manufacturers to carry out the purposes of titles I and IV of the Anti Car Theft Act of 1992, the Automobile Information Disclosure Act (15 U.S.C. 1231 et seq.), the Clean Air Act (42 U.S.C. 7401 et seq.), and chapters 301, 305, and 321–331 of title 49, and, subject to subsection (a)(2), may be disclosed as follows:

(1) For use by any government agency, including any court or law enforcement agency, in carrying out its functions, or any private person or entity acting on behalf of a Federal, State, or local agency in carrying out its functions.

(2) For use in connection with matters of motor vehicle or driver safety and theft; motor vehicle emissions; motor vehicle product alterations, recalls, or advisories; performance monitoring of motor vehicles, motor vehicle parts and dealers; motor vehicle market research activities, including

individual has given the state "express consent," the information can be given to any requester. 18 U.S.C. § 2721(b)(11)-(14).

■ Congress enacted the DPPA in response to mounting public safety concerns over the easy access to state motor vehicle records by stalkers and other criminals.[16] See Locate.Plus.Com, Inc. v. Iowa Department of Transportation, 650 N.W.2d 609, 614 (Iowa 2002) (citing Reno, 528 U.S. at 143–144, 120 S.Ct. 666). The DPPA protects individual privacy rights while also authorizing access for legitimate purposes.[17]

In this case, Hartman sought the information so that he could mail the Keystone Snowmobiler to snowmobile registrants. The monthly Keystone Snowmobiler is the official publication of the Pennsylvania State Snowmobile Association, Inc. (PSSA), an organization of snowmobile owners, dealers, manufacturers of vehicles and accessories, and members of the tourist industry associated with snowmobiling. The purpose of the PSSA is to promote snowmobiling as a sport in Pennsylvania; the content of its magazine reflects this purpose. Although the September 2005 issue of the magazine contained some safety announcements, 40 out of the 48 pages contained advertisements and listings for vendors of snowmobiles, snowmobile gear, motels, restaurants, stores, campground

survey research; and removal of non-owner records from the original owner records of motor vehicle manufacturers.

(3) For use in the normal course of business by a legitimate business or its agents, employees, or contractors, but only—

(A) to verify the accuracy of personal information submitted by the individual to the business or its agents, employees, or contractors; and

(B) if such information as so submitted is not correct or is no longer correct, to obtain the correct information, but only for the purposes of preventing fraud by, pursuing legal remedies against, or recovering on a debt or security interest against, the individual.

* * *

(11) For any other use in response to requests for individual motor vehicle records if the State has obtained the express consent of the person to whom such personal information pertains.

(12) For bulk distribution for surveys, marketing or solicitations if the State has obtained the express consent of the person to whom such personal information pertains.

(13) For use by any requester, if the requester demonstrates it has obtained the written consent of the individual to whom the information pertains.

(14) For any other use specifically authorized under the law of the State that holds the record, if such use is related to the operation of a motor vehicle or public safety.

16. The watershed event behind the enactment of the DPPA was the 1989 murder of actress Rebecca Schaeffer, who starred in the television series "My Sister Sam." See Maureen Maginnis, Maintaining the Privacy of Personal Information: The DPPA and the Right of Privacy, 51 S.C. L.Rev. 807, 809 (2000). Schaeffer was shot and killed outside her apartment by a stalker who obtained her unlisted address from the California Department of Motor Vehicles. The easy access of personal information by stalkers, domestic abusers, and other criminals was also a major impetus for the enactment of similar state laws. See DeVere v. Attorney Gen., 146 N.H. 762, 781 A.2d 24, 26 (2001). Prior to enactment of the DPPA, most states granted almost total public access to personal information in motor vehicle records. Maintaining the Privacy of Personal Information, 51 S.C. L.Rev. at 809.

17. See, e.g., Russell v. Choicepoint Services, Inc., 302 F. Supp 2d 654, 664 (E.D.La., 2004) (authorizing Reed Elsevier to obtain drivers' personal information from state motor vehicle departments for the narrow purpose of redistributing such information through its Lexis/Nexis service to persons for permissible uses); Miller v. Image Data LLC, 91 Fed. Appx. 122 (10th Cir.2004) (Colorado Department of Motor Vehicle's disclosure of digitized portrait image authorized as disclosure pursuant to government function).

and other segments of the tourism industry associated with snowmobiling. Upon this record, DCNR concluded the main purpose of the *Keystone Snowmobiler* was to promote the PSSA and to increase its membership.

Although Hartman contends he requested the information to promote snowmobile safety, it is clear the requested information would be used primarily to promote snowmobiling in Pennsylvania and membership in the PSSA. The mere placement of safety information in one edition of the magazine cannot transform a commercial use into a "use in connection with matters of motor vehicle or driver safety." 18 U.S.C. § 2721(b)(2). Hartman's proffered construction would be inconsistent with Congress' intent to limit disclosure of this personal information for "surveys, marketing, or solicitations" unless the individual has given the State "express consent" for such a disclosure. 18 U.S.C. § 2721(b)(12). Hartman intends to use this information to market snowmobiling and the PSSA, but the registrants have not consented to the release of their names for this use. Disclosure is prohibited. As a consequence, the information is excepted from the definition of a public record under Section 1 of the Right–to–Know Law, because it is prohibited by a "statute law," such as the DPPA.[18] 65 P.S. § 66.1.

■ Our conclusion that disclosure of the requested names and addresses is prohibited by federal statute technically ends our inquiry in this matter. We find it necessary, however, to address Hartman's argument that the Exceptions Official erred by concluding that the requested information is excepted from the definition of "public record" under the Right–to–Know Law because disclosure of such information "would operate to the prejudice or impairment of [the registrants'] reputation or personal security." Section 1 of the Right–to–Know Law, 65 P.S. § 66.1.[19]

■ This Court interprets the personal security and reputation exceptions as creating a privacy exception to the Right–to–Know Law's general rule of disclosure. *Cypress Media, Inc. v. Hazleton Area School District*, 708 A.2d 866, 870 (Pa. Cmwlth.1998). It is also generally accepted that a person has a privacy interest in his or her home address. *See e.g., Sapp Roofing Co., Inc. v. Sheet Metal Workers' International Association, Local Union No. 12*, 552 Pa. 105, 111, 713 A.2d 627, 630 (1998) (for purposes of ensuring compliance with Prevailing Wage Act, labor union could access school district's records on wage information of private contractor's employees but not employees' names, addresses, social security numbers and phone numbers); *Cypress Media, Inc.*, 708 A.2d at 870 (noting that a person's home address, home telephone number and social security number are not subject to disclosure under the Right–to–Know Law

---

18. We reject DCNR's argument that a violation of the DPPA will result in a loss of federal funding. The only penalty applicable to state actors for violating the DPPA provides for the imposition of a civil penalty of not more than $5,000 a day for every day of noncompliance, not a loss of TEA–21 funds. 18 U.S.C. § 2723(b). Section 350(f) of TEA–21 states that funds will not be withheld for violating TEA–21, including the provision forbidding disclosure of names and addresses of snowmobile registrants.

19. Hartman contends that disclosure of snowmobile registrants' names does not implicate Pennsylvania's constitutional right of privacy, citing to *Commonwealth v. Duncan*, 572 Pa. 438, 462, 817 A.2d 455, 469 (2003) (holding that there is no reasonable expectation of privacy in one's name in a criminal matter involving the seizure of a name and address). *Duncan*, a criminal case, is not applicable to a civil proceeding arising under the Right–to–Know Law.

because the benefits of disclosing such information are outweighed by a person's privacy interests in that information).

The privacy exception, however, is not absolute. When analyzing this exception this Court applies a balancing test, weighing the privacy interests, and the extent to which they may be invaded, against the public benefits that would result from disclosure. *Times Publishing Co., Inc. v. Michel,* 159 Pa.Cmwlth. 398, 633 A.2d 1233, 1239 (1993). For example, in *Goppelt v. City of Philadelphia Revenue Department,* 841 A.2d 599 (Pa.Cmwlth. 2004), this Court held that the mailing addresses of delinquent taxpayers were subject to disclosure. We reasoned that disclosure could have a significant public benefit by aiding in service of process and facilitating communications with an absentee landowner regarding the condition of property, actions of tenants on the property, and offers to purchase or lease the property.

In support of his request, Hartman contends the public benefit of disseminating snowmobile safety information outweighs any impairment to the registrants' privacy interests. He also argues that this Court has routinely determined that names and addresses constitute public records subject to disclosure. Hartman's argument in this regard is based largely on *Mergenthaler v. State. Employees' Retirement Board,* 33 Pa. Cmwlth. 237, 372 A.2d 944 (1977). Hartman's reliance on this decades-old case is misplaced.

In *Mergenthaler,* this Court held that the names and addresses of retired state employees were encompassed by the definition of "public record" in the Right–to–Know Law, and that disclosure of such information could not impair the employees' personal security. In reaching that decision we relied on *Young v. Armstrong School District,* 21 Pa.Cmwlth. 203, 344 A.2d 738 (1975), in which a list of the names and addresses of each child entering kindergarten was held subject to disclosure because "personal security" under the Right–to–Know Law was considered distinct from "personal privacy." It was this distinction that was followed in *Mergenthaler. See Mergenthaler,* 372 A.2d at 947. However, this Court expressly overruled *Young* in *Tribune–Review Publishing Co. v. Allegheny County Housing Authority,* 662 A.2d 677, 683 n. 9 (Pa.Cmwlth. 1995), and held that a right of privacy exists in the Right–to–Know Law. In light of this fundamental change in our jurisprudence, the precedential value of *Mergenthaler* is limited and we decline to follow it here.[20]

With respect to the balancing test described in *Michel,* we agree with DCNR's conclusion that the public benefit of disclosure is outweighed by the registrants' privacy interest in their names and addresses. Hartman's arguments to the contrary fail for two reasons. First, Hartman's publication is not the only source of safety information for registered snowmobile owners. DCNR provides brochures which are distributed to snowmobile registrants, forest district offices, legislators' offices and certified snowmobile safety instructors. DCNR distributes information on snowmobile safety at various trade shows throughout the Commonwealth. Finally, safety information is also posted on DCNR's website. Therefore, although the safety information in Hartman's magazine is beneficial, it merely supplements similar

---

**20.** *See also Rowland v. Public School Employees' Retirement System,* 885 A.2d 621, 629 n. 11 (Pa.Cmwlth.2005).

information already widely disseminated by DCNR.

Second, the benefit asserted by Hartman is not to the public at all but to the PSSA, which has an interest in sustaining its own existence through recruitment of new members and deriving commercial gain from its publication of the *Keystone Snowmobiler*. Thus, because there are nominal public benefits against which to balance the privacy interest of the snowmobile registrants, the balance tips easily in favor of non-disclosure of the requested information.

Accordingly, we affirm the determination of DCNR.

## ORDER

AND NOW, this 16th day of February, 2006, the order of the Department of Conservation and Natural Resources dated May 31, 2005, in the above-captioned matter is hereby affirmed.